Michael E. WALLACE, David Jacaruso and Joseph Scotti, Petitioners–Appellees,

v.

Daljit S. BUTTAR and Paramjit Buttar, Respondents–Appellants,

Robert Winston, Additional Respondent.

Docket No. 03–7158.

United States Court of Appeals, Second Circuit.

Argued: Oct. 14, 2003.

Decided: Aug. 5, 2004.

Robert S. Wolf, Gersten, Savage, Kaplowitz, Wolf & Marcus, LLP, New York, NY, for Petitioners–Appellees David Jacaruso and Joseph Scotti.

Stuart A. Jackson, Re, Parser & Partners, New York, NY, for Petitioner–Appellee Michael E. Wallace.

David B. Chenkin, Zeichner Ellman & Krause LLP, New York, NY, Stanley T. Padgett, Morgan, Padgett & Associates, P.A., Tampa, FL, for Respondents–Appellants Daljit S. Buttar and Paramjit Buttar.

Before: JACOBS, POOLER, and WESLEY, Circuit Judges.

POOLER, Circuit Judge.

This case raises questions regarding the scope of federal court review of a decision issued by an arbitral panel. We resolve the case through the application of the familiar principle that the scope of such review is highly constrained. This is especially true with regard to an arbitral panel's assessment of whether the documentary and testimonial evidence presented to it is sufficient to satisfy a particular legal claim. Federal district judges are, of course, highly skilled in matters of weighing evidence. As illustrated by the result we reach here, however, district judges must put these skills aside when faced with the question of whether a decision issued by an arbitral panel should be confirmed.

## FACTS

### A. The Buttars' Claim.

Daljit and Paramjit Buttar, who are husband and wife, are residents of Raleigh, North Carolina. Daljit Buttar (hereafter "Dr. Buttar") is a physician specializing in neurology, and is currently in solo practice.

Dr. Buttar has assumed sole responsibility for managing his family's finances. In 1999, he happened to meet Vivek Verma, a stockbroker based in New York City, at a social event in North Carolina. At this event, and in a series of subsequent telephone calls, Dr. Buttar and Verma discussed the Buttar family's current investments and future investment goals. In July 1999, Verma persuaded Dr. Buttar to open the first of a series of investment accounts at the firm for which he worked, Montrose Capital Management ("Montrose"). The application signed by Dr. Buttar when he opened this account contains the following provision:

> All controversies which may arise between us concerning any transaction, or the construction, performance or breach of this or any other agreement between us, whether entered into prior, on, or subsequent to the date hereof, shall be determined by arbitration in accordance with the Federal Arbitration Act to the fullest extent permitted by law. The arbitration shall be determined only before and in accordance with the rules then in effect of either the New York Stock Exchange, Inc., or the National Association of Securities Dealers, Inc. or any other exchange or self-regulatory organization of which [Montrose is] a member as I may elect. The award of the arbitrators, or of the majority of them, shall be final . . . .

We note that, immediately preceding the arbitration clause, the application sets forth the following "understanding" in bold lettering: **"The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by arbitrators is strictly limited."**

Soon after opening this initial account, Dr. Buttar also began to discuss his investments with Robert Winston. Winston's

actual responsibilities at Montrose are not entirely clear from the record, but Dr. Buttar testified that Winston "talked to me like he was the owner" of the firm. Verma himself testified that while he worked at Montrose he was under the impression that Winston ran the firm.

Verma and Winston successfully urged Dr. Buttar to make substantial investments in the securities of two firms: (1) Skynet Holdings, Inc. ("Skynet") and (2) CNF Technologies ("CNF"). Dr. Buttar was also persuaded to provide a "bridge loan" to CNF in the amount of $150,000.00. Eventually, Dr. Buttar alleges, Montrose "had invested virtually all of [his] liquid assets in CNF and Skynet." It is undisputed that Dr. Buttar suffered substantial losses as a result.

**B. The Arbitration Proceeding.**

On September 11, 2000, the Buttars instituted an arbitration proceeding by filing a statement of claim with the National Association of Securities Dealers, Inc. ("NASD"), which names Montrose and Winston as respondents. The statement of claim alleges that Winston and Verma made numerous false statements to Dr. Buttar regarding the wisdom of investing in Skynet and CNF. These included characterizing Skynet as "a long-term safe investment" when it was in fact "a thinly traded bulletin board stock," falsely representing that Skynet's immediate prospects were particularly favorable because it "was in the process of a buyout by Federal Express," and assuring Dr. Buttar that the principal amount of his loan to CNF would be returned to him "plus ten percent within two months, 'guaranteed.'" The Buttars sought compensatory damages in the amount of $1,375,000.00 and an unspecified amount of punitive damages.

The Buttars filed an amended statement of claim with the NASD on March 9, 2001,

which repeats the factual allegations of their original pleading, but which names Michael E. Wallace, David Jacaruso and Joseph Scotti as respondents in addition to Montrose and Winston. Liability as to Wallace, Jacaruso, and Scotti is set forth in the following allegation:

> Respondents Wallace, Jacaruso and Scotti are liable as control persons of Respondents Montrose, Winston and Verma. *See* 15 U.S.C. § 78t(a); 15 U.S.C. § [77o [1]]; [North Carolina General Statute] § 78A–56(a)(2)(c) . . . .

> \* \* \* \* \* \*

> Respondents possessed the power to control and supervise the operations of Montrose, Winston and Verma and knew or should have known that Montrose, Winston and Verma were handling Claimants' accounts in an unsuitable manner, making unauthorized trades [and] were making misrepresentations to Claimants. Respondents, as control persons, failed to properly superivse the activities of Montrose, Winston and Verma, but benefitted from the improper and illegal activities conducted by Montrose, Winston and Verma.

> \* \* \* \* \* \*

> . . . . Respondents Montrose, Wallace, Jacaruso and Scotti are responsible for the wrongdoing of its registered representatives due to the doctrine of respondeat superior, for failing in all respects to supervise the account activity. Respondents Wallace, Jacaruso and Scotti are liable as control persons. The conduct of respondents violated the federal securities laws, state statutory and common law, and the rules and regulations of the National Association of Securities Dealers, Inc. and the securities industry.

The Buttars' claim was assigned to a three-person arbitration panel ("the Panel"). None of the Panel's members is an attorney, but they are all seasoned business executives with substantial experience as arbitrators. On May 29, 2001 the Panel granted Winston's motion, which was joined by Wallace, Jacaruso, and Scotti, to assert a third-party claim against Verma.

The Panel conducted a three-day hearing on the Buttars' claim in November 2001. Although they were all represented by counsel at the hearing, Winston, Jacaruso, and Scotti chose not to appear in person and did not give any testimony. Wallace was also represented by counsel and testified very briefly by telephone.

A central issue on this appeal is whether the Panel could conclude that Wallace, Jacaruso, and Scotti are liable to the Buttars as control persons of Montrose. During his opening statement to the Panel, counsel for Wallace, Jacaruso, and Scotti denied that the three men could be found liable as control persons and alerted the Panel to his intention to move for dismissal on this ground at the close of evidence. This motion was in fact made, but the Panel declined to rule on it "until all of the various written pleadings and memoranda have been reviewed." The Buttars submitted a post-hearing memorandum to the Panel which sets forth the basic principles of control person liability under North Carolina and federal law. Counsel for Wallace, Jacaruso, and Scotti, however, submitted a post-hearing memorandum which is notable for its use of invective, but which is almost completely devoid of legal discussion of any type. It devotes slightly more than one-half of a page to the law of control person liability, and does not discuss North Carolina law at all. The Buttars and Wallace, Jacaruso, and Scotti also

---

**1.** The actual citation here is to § 771, which we presume to be a mistake because that section has nothing to do with control person liability.

submitted reply memoranda to the Panel regarding the common law issues of laches and respondeat superior.

The evidence before the Panel regarding the status of Wallace, Jacaruso, and Scotti as control persons was neither non-existent nor overwhelming. In the first place, documents filed by Montrose with the Securities and Exchange Commission tend to support a finding of control person status. On a "Form BD"—a Uniform Application for Broker–Dealer Registration—filed by Montrose in May 1999, Wallace is identified as the firm's president. On the same form, Jacaruso and Scotti are identified as directors who each owned a 50% share of Montrose, but only Wallace is actually identified as a "control person." On an amended Form BD, however, dated November 11, 1999, Jacaruso and Scotti are listed as each owning a 25% to 50% interest in Montrose and each, along with Wallace, is listed as a "control person." Two subsequent Form BD amendments, dated December 17, 1999 and December 21, 2000, repeat this listing.

The Panel also heard the testimony of Michael Kavanagh, a stockbroker who came to work at Montrose upon a promise that he would be given a 5% ownership interest in the firm. Kavanagh testified that upon his arrival at Montrose, Winston urged him to buy Skynet and CNF securities for the accounts of the clients he had brought with him to the firm. Upon meeting with representatives of both companies, however, Kavanagh decided that he "wasn't too impressed with either one of them."

As time went on, Kavanagh became increasingly concerned that other brokers at Montrose "were being forced [by Winston] to buy ... securit[ies] that they didn't want to buy for their customers." Kavanagh testified that he eventually brought his complaints about Winston's conduct to

Jacaruso, whom he identified as "the Chairman" of Montrose. Kavanagh recalled that Jacaruso "made an agreement with me that he was going to deal with this Robert Winston issue" and that Jacaruso told him "[j]ust don't pay any attention to Robert's antics, and I'll take care of it." Kavanagh also averred that Winston's misconduct was "the topic of numerous conversations on my part in the partners' meetings," and that such meetings "were really never held without all the partners there." Nowhere in his testimony does Kavanagh state that his complaints about Winston were ever acted upon. Kavanagh eventually left the firm, testifying that he did so because "Montrose is a criminal activity. It's a pump and dump operation. It's a fraud. It's a scam ...."

Dr. Buttar himself testified that, prior to filing the arbitration claim, he had never heard of Wallace, Jacaruso, or Scotti. The Buttars also offered the testimony of William Collison as an expert witness in securities investing. With respect to the responsibility of Jacaruso and Scotti for the losses suffered by the Buttars, Collison testified that "they are directors of the firm. They are on the Form BD [as] the owners of the firm and ... responsibility for what goes on in that firm ultimately rests with them." Collison further declared that Jacaruso and Scotti "as owners of the firm acquiesced, approved, sanctioned, use whatever term pleases you, the activities of Mr. Winston ...." Collison also testified, however, that he had no basis for concluding that Jacaruso and Scotti had actual knowledge of the trades being made in the Buttars' particular accounts.

As already noted, Jacaruso and Scotti did not testify before the Panel. Wallace, however, testified that he "was in control of everyone performing their functions" at Montrose. Wallace also acknowledged

that he signed the Securities and Exchange Commission documents which name him, Jacaruso, and Scotti as control persons of Montrose and that he believed that this information "was true, accurate and complete." Kavanagh, however, characterized Wallace as being "closer in power to the janitor than the president" of Montrose, and that he believed "a lot of things that happened at the firm were done without Mike Wallace's knowledge."

## C. The Panel's Award.

The NASD served all parties with a copy of the Panel's determination of the Buttars' claim ("the Award") on March 8, 2002. On December 7, 2001 the U.S. District Court for the Southern District of New York had issued a stay of all legal proceedings against Montrose pursuant to § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a). Accordingly, the Award states that the Panel "made no determination with respect to the claims asserted against" Montrose, but that the stay "does not apply to Respondents Winston, Wallace, Scotti and Jacaruso."

The Award contains no factual findings beyond briefly outlining the terms of the parties' claims and defenses. The determination of liability is set forth in relevant part as follows:

1. The Panel finds Respondent Winston liable for misrepresentation; unauthorized, unsuitable and over-concentrated trading in Skynet and CNF Technologies; and fraud. The Panel finds Respondents Wallace, Scotti and Jacaruso liable for fraud and also as "Control Persons". See 15 U.S.C. 78t(a); 15 U.S.C. [77o [2]]; [North Carolina General Statute] 78A–56(a)(2)(c).

2. Respondents Winston, Wallace, Scotti and Jacaruso are jointly and severally liable and shall pay to Claimants compensatory damages in the amount of $1,064,543.00, plus pre-judgment interest from June 1, 2000 through January 30, 2001 in the amount of $127,629.00. Post-judgment interest shall accrue in accordance with Rule 10330(h) of the [NASD Code of Arbitration Procedure].

3. Respondents Winston, Wallace, Scotti and Jacaruso are jointly and severally liable and shall pay to Claimants punitive damages in the amount of $604,805.00. The Panel finds Respondent Winston liable for punitive damages based upon the Panel's finding of fraud. The Panel finds the control persons, Respondents Wallace, Scotti and Jacaruso, liable for punitive damages based upon the Panel's finding of fraud. See *Hunt v. Miller,* 908 F.2d 1210, 1216 n. 15 (4th Cir.1990). "An employer is liable for an agent's fraud when committed within the scope of the agent's apparent authority, even when the principal did not know or authorize the commission of the fraudulent acts." Also, "a master is liable for punitive damages awarded when the servant or agent causing the injury was acting in the course and scope of the master's business." See also *Black's Law Dictionary,* 6th Ed.1991, 455ff. Post-judgment interest shall accrue in accordance with Rule 10330(h) of the [NASD Code of Arbitration Procedure.]

## D. The District Court's Decision.

The Buttars filed an action on June 3, 2002 in the U.S. District Court for the Eastern District of North Carolina seeking confirmation of the Award. Four days later, Wallace, Jacaruso, and Scotti filed actions to vacate the Award in the U.S.

---

**2.** The Award actually cites § 771, thereby repeating the mistake made by the Buttars in their amended statement of claim. *See supra,* at 5, n. 1.

District Court for the Southern District of New York. The Buttars thereupon voluntarily dismissed the North Carolina action, and crossed-moved for confirmation of the Award in the New York action. Winston filed no action to vacate the Award and has not filed any opposition the Buttars' cross-motion to confirm the Award.

The district court granted the motions to vacate the Award, and consequently denied the cross-motion to confirm the Award. *See Wallace v. Buttar*, 239 F.Supp.2d 388 (S.D.N.Y.2003). The district court took it to be "undisputed that Winston, a broker employed by Montrose, committed a primary violation of the securities laws, that Jacaruso and Scotti were directors and shareholders of Montrose and Wallace was its president." *Id.* at 395. The question then became whether the Panel could have properly found Wallace, Jacaruso, or Scotti in any way liable for Winston's acts.

The district court held that, in addition to the grounds for vacating an arbitration award set forth in the Federal Arbitration Act ("FAA"), *see* 9 U.S.C. § 10, "the Second Circuit[ ] recognize[s] two additional bases for vacating arbitration awards: manifest disregard of the law and manifest disregard of the facts." *Wallace*, 239 F.Supp.2d at 392. In the district court's view, the Panel could not have found Wallace, Jacaruso, or Scotti liable for the Buttars' losses without engaging in both sorts of disregard. First, secondary liability pursuant to the doctrine of respondeat superior could not lie because the doctrine "imposes liability on the employer of those committing fraud in their employment. The entity that could have been held liable for Winston's fraud under the doctrine ... was Montrose, Winston's employer." *Id.* at 394. Second, Wallace, Jacaruso, and Scotti could not be found liable as co-participants in Winston's scheme to de-

fraud the Buttars because "[i]n order to commit fraud, one must act with intent to defraud." *Id.* The district court held that no evidence put before the Panel could serve as the basis of a finding of such intent on the part of Wallace, Jacaruso, or Scotti:

> The totality of the evidence ... overwhelmingly indicates that Wallace never dealt with the Buttars, lacked awareness of all wrongdoing in respondents' account, [and] had no duty nor reason to educate himself of the activity in the Buttars' accounts .... There was no evidence of any action taken by Jacaruso and Scotti in connection with the transactions in which Winston defrauded the Buttars.

> Clearly the arbitrators could not have found that Wallace, Jacaruso and Scotti possessed the requisite intention to defraud the Buttars without manifestly disregarding this evidence, or lack of evidence.

*Id.* at 394–95.

Finally, the district court held that the Panel manifestly disregarded the law and the evidence by holding Wallace, Jacaruso, and Scotti liable as control persons because "[t]he Buttars rely solely on Wallace's status as President and Jacaruso and Scotti's designation as a control person of Montrose." *Id.* at 396. The district court observed, however, that status alone does not suffice to make one liable as a control person. Rather, "the control person must additionally possess the necessary mental culpability by either knowing, or failing to know due to their [sic] own recklessness or negligence, of the alleged wrongdoing." *Id.* at 395. Upon its review of the evidentiary record, the district court found "[n]o evidence [had been] adduced that the Petitioners were involved in the allegedly unsuitable and unauthorized transactions in the Buttars' accounts." *Id.*

at 396. Therefore, a finding of intent as to Wallace, Jacaruso, and Scotti could only be the Panel's invention, made in disregard of the evidentiary record before it.

### DISCUSSION

■ "When a party challenges the district court's review of an arbitral award under the manifest disregard standard, we review the district court's application of the standard *de novo.*" *The GMS Group, LLC v. Benderson,* 326 F.3d 75, 77 (2d Cir.2003) (citing *Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22, 28 (2d Cir. 2000)).

### A. The Scope of Federal Court Review of an Arbitration Award.

■ A motion to vacate filed in a federal court is not an occasion for *de novo* review of an arbitral award. "It is well established that courts must grant an arbitration panel's decision great deference. A party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,* 333 F.3d 383, 388 (2d Cir.2003). The FAA sets forth certain grounds upon which a federal court may vacate an arbitral award, but "all of [these] involve corruption, fraud, or some other impropriety on the part of the arbitrators." *Id.; see* 9 U.S.C. § 10(a). The district court did not hold, nor did it in any way imply, that the Award is the result of an act of corruption or unseemliness on the part of the Panel. We therefore immediately proceed to a consideration of the cases within our Circuit which have recognized grounds for vacating an arbitral award other than outright perfidy on the part of arbitrators. We conclude that the district court took too broad a view of these grounds for vacatur.

### 1. Manifest Disregard of the Law.

■ Our circuit has long held that "[a]n arbitration award may be vacated if it exhibits 'a manifest disregard of the law.'" *Goldman v. Architectural Iron Co.,* 306 F.3d 1214, 1216 (2d Cir.2002) (quoting *DiRussa v. Dean Witter Reynolds, Inc.,* 121 F.3d 818, 821 (2d Cir.1997)). But we have also been quick to add that "manifest disregard of law" as applied to review of an arbitral award is a "severely limited" doctrine. *Gov't of India v. Cargill Inc.,* 867 F.2d 130, 133 (2d Cir.1989) (internal quotation marks and citation omitted). Indeed, we have recently described it as "a doctrine of last resort—its use is limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Duferco,* 333 F.3d at 389. Accordingly, we have said that the doctrine "gives extreme deference to arbitrators." *DiRussa,* 121 F.3d at 821.

■ An arbitral award may be vacated for manifest disregard of the law "only if 'a reviewing court ... find[s] both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.'" *Banco de Seguros del Estado v. Mutual Marine Office, Inc.,* 344 F.3d 255, 263 (2d Cir.2003) (quoting *Greenberg,* 220 F.3d at 28). We have emphasized that an arbitral panel's refusal or neglect to apply a governing legal principle "'clearly means more than error or misunderstanding with respect to the law.'" *Hoeft v. MVL Group, Inc.,* 343 F.3d 57, 69 (2d Cir.2003) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933

(2d Cir.1986)). A federal court cannot vacate an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law. On the contrary, the award "should be enforced, despite a court's disagreement with it on the merits, if there is a *barely colorable justification* for the outcome reached." *Banco de Seguros del Estado,* 344 F.3d at 260 (emphasis added; citation and quotation marks omitted); *see also Hoeft,* 343 F.3d at 70–71 (confirming award and stating that it "is of no consequence" that arbitrator's decision did not apply the "clear majority view" of a certain principle of accounting law); *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,* 304 F.3d 200, 216, n. 10 (2d Cir.2002) (award would be confirmed regardless of the court's "serious reservations about the soundness of the arbitrator's reading" of the contract at issue); *St. Mary Home, Inc. v. Service Employees Int'l Union, Dist. 1199,* 116 F.3d 41, 44–45 (2d Cir.1997) ("Internal inconsistencies in the [arbitrator's] opinion are not grounds to vacate the award notwithstanding the [movant's] plausible argument that the arbitrator's decision was misguided or our own concerns regarding the arbitrator's conclusion.")

■■ In sum, a court reviewing an arbitral award cannot presume that the arbitrator is capable of understanding and applying legal principles with the sophistication of a highly skilled attorney. Indeed, this is so far from being the case that an arbitrator "under the test of manifest disregard is ordinarily assumed to be a blank slate unless educated in the law by the parties." *Goldman,* 306 F.3d at 1216. There is certainly no requirement under the FAA that arbitrators be members of the bar and we have recognized "that arbitrators often are chosen for reasons other than their knowledge of applicable law." *Duferco,* 333 F.3d at 390.

Further, "arbitrators are not required to provide an explanation for their decision." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir.1997). As already noted, the arbitration clause in this case explicitly informed the parties that they should not expect the Award to be accompanied by any explanation of the Panel's reasoning. *See supra,* p. 3.

Our cases demonstrate that we have used the manifest disregard of law doctrine to vacate arbitral awards only in the most egregious instances of misapplication of legal principles. In *New York Telephone Co. v. Communications Workers of America Local 1100,* 256 F.3d 89 (2d Cir. 2001) (per curiam), an arbitral award cited precedent from two of our sister circuits, and expressly declined to apply contrary precedent from this Circuit. The award justified its conclusion as follows: " 'As for the argument that the law of the 2nd Circuit is different and controlling, that can be tested, if needs be, by this decision. [The Second Circuit decision at issue] was decided 34 years ago.... Perhaps it is time for a new court decision.' " *Id.* at 91 (alteration in original). We held that this explicit rejection of controlling precedent constituted manifest disregard of the law. *Id.* at 93.

In *Hardy v. Walsh Manning Securities, L.L.C.,* 341 F.3d 126 (2d Cir.2003), an arbitral panel found the manager of a brokerage firm ("Skelly") liable for fraudulent securities transactions undertaken by an employee of the firm "based upon the principles of respondeat superior." *Id.* at 128. We noted that as a matter of definition "respondeat superior is a form of secondary liability that cannot be imposed upon the fellow employee of a wrongdoer." *Id.* at 130. This made the arbitral award highly problematic "because of the undisputed fact that Skelly is an employee, not

an officer, of" the brokerage firm. *Id.* at 128. We were thus faced with an award which contained an actual logical impossibility: the imposition of respondeat superior liability upon a fellow employee of a wrongdoer. Even though we held that this constituted manifest disregard of the law, we noted our "reluctan[ce] to announce that the Award is void outright as written," *id.* at 134, and remanded it to the arbitration panel for clarification of the basis of Skelly's liability.

Finally, we note that raw numbers demonstrate the rarity with which we have vacated an arbitral award pursuant to the manifest disregard of law doctrine. In *Duferco,* decided in 2003, it was calculated that "since 1960 [this Court has] vacated some part or all of an arbitral award for manifest disregard in … four out of at least 48 cases where we applied the stan-

dard." 333 F.3d at 389. To say the least, these are sobering odds.[3]

## 2. Manifest Disregard of the Evidence.

■ Citing *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202, 204 (2d Cir.1998), the district court held that an arbitral award may be may be vacated on the ground of "[m]anifest disregard of the facts" when the award "runs contrary to 'strong' evidence favoring the party bringing the motion to vacate." *Wallace,* 239 F.Supp.2d at 392.[4] We note that a number of other district courts in our Circuit, directly relying on *Halligan* or on district court authority purporting to rely on that case, have asserted the same principle. *See, e.g., Hakala v. Deutsche Bank AG,* No. 01 Civ. 3366, 2004 WL 1057788 at *6

3. One commentator has argued that "there are powerful reasons why the manifest disregard standard should be replaced by a broader standard …. Because the manifest disregard standard protects an arbitral award from vacatur if the arbitrators did not know the law, it encourages arbitrators not to find out what the law is …." Norman S. Poser, *Judicial Review of Arbitration Awards: Manifest Disregard of the Law,* 64 Brook. L.Rev. 471, 515 (1998). We disagree with this contention because it seems to imply that arbitrators will not approach their task in a professional manner. It may be true that "[a]rbitrators should not be potted palms. As decision-makers, they have an obligation to ascertain what the law is and to apply it correctly." *Id.* (footnote omitted). But until the FAA is amended to require that arbitrators be attorneys, or that they possess a certain standard of legal knowledge, we see no basis upon which we can impose a duty upon arbitrators to ascertain the legal principles that govern a particular claim through the conduct of independent legal research. That is, we expect arbitrators to ascertain the law through the arguments put before them by the parties to an arbitration proceeding. We recognize the possibility that a case may arise that presents concerns about the relative capacities of the parties to

put the law before an arbitral panel; that is, a case where "the dispute is not between roughly equal commercial entities but between parties that are unequal in wealth and sophistication." *Id.* This is clearly not such a case, however.

4. The district court also relied upon two cases from the Ninth Circuit in order to support its conclusion. *See* 239 F.Supp.2d at 393–94 (discussing *American Postal Workers Union AFL–CIO v. U.S. Postal Service,* 682 F.2d 1280 (9th Cir.1982); *Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.,* 935 F.2d 1019 (9th Cir.1991)). Such reliance is seriously undermined, however, by the Ninth Circuit's recent unambiguous statement (issued after the district court's opinion in the instant case), that "[m]anifest disregard of the facts is not an independent ground for vacatur in this circuit." *Coutee v. Barington Capital Group, L.P.,* 336 F.3d 1128, 1133 (9th Cir.2003). The *Coutee* court also opined that "it does not appear that any other circuit has adopted a manifest disregard of the facts standard," and that "the Second Circuit has recently clarified that *Halligan* is based on the traditional manifest disregard of the *law* standard." *Id.* at 1133, n. 5 (emphasis in original; citing *GMS Group,* 326 F.3d at 79).

(S.D.N.Y. May 11, 2004); *Gwynn v. Clubine,* 302 F.Supp.2d 151, 167–68 (W.D.N.Y. 2004); *Ono Pharmaceutical Co., Ltd. v. Cortech, Inc.,* No. 03 Civ. 5840, 2003 WL 22481379 at *2 (S.D.N.Y. Nov.3, 2003); *Tripi v. Prudential Securities, Inc.,* 303 F.Supp.2d 349 (S.D.N.Y.2003); *Raiola v. Union Bank of Switzerland LLC,* 230 F.Supp.2d 355, 357 (S.D.N.Y.2002); *GFI Securities LLC v. Labandeira,* No. 01 Civ. 00793, 2002 WL 460059 at *4 (S.D.N.Y. March 26, 2002); *McDaniel v. Bear Stearns & Co., Inc.,* 196 F.Supp.2d 343, 351 (S.D.N.Y.2002). Such reliance is mistaken.

In *Halligan,* we reviewed a district court's confirmation of an arbitration award which rejected an employment discrimination claim. We reversed, finding that the award had been made in the face of "overwhelming evidence" that discriminatory conduct had occurred. 148 F.3d at 203. This evidence included the employer's admission that the claimant's "performance was not so unsatisfactory as to justify [his] discharge," and considerable circumstantial evidence that we found to be "consistent only with a finding that [the claimant] was pushed out of his job" by discriminatory animus. *Id.* Further, the arbitration panel issued no explanation for its rejection of the claim, and we concluded that any explanation it could have given "would have strained credulity." *Id.* at 204. We held that the district court had erred in confirming the award because the evidence in the claimant's favor was so strong as to engender "the firm belief that the arbitrators here manifestly disregarded the law or the evidence or both." *Id.*

Our later cases, however, have cautioned against an over-broad reading of *Halligan.* In *GMS Group,* we noted that *Halligan* confronted "the unique concerns at issue with employment discrimination claims." 326 F.3d at 79. These concerns included "whether the composition of industry-specific panels were ill-suited to the nature of the claims, and whether employees were receiving due process in the course of arbitration." *Id.* We concluded, however, that "[t]hese concerns do not translate to the claims at issue in this case." *Id. GMS Group* dealt with a securities fraud claim, as does the instant case.

Further, in *Westerbeke* we explicitly characterized *Halligan*'s suggestion that arbitral awards may be vacated on the ground of manifest disregard of evidence as dicta. 304 F.3d at 213, n. 9. We explained this conclusion in the following way:

> *Halligan* presented the special circumstance in which the arbitration tribunal did not issue a written explanation of its factual findings. The reviewing court was therefore placed in the situation of attempting to discern what possible findings the arbitrators *could* have made that would justify their disposition of the case. Unable to come up with any findings that would not "strain credulity," the court concluded that the tribunal must have "manifestly disregarded the law or the evidence or both." [*Halligan,* 148 F.3d at 204.] *Halligan does not stand for the proposition that factual findings put on the record by the arbitrator are subject to an independent judicial review, however.*

*Id.* (first emphasis in original; second emphasis added).

 Moreover, if a federal court is convinced that an arbitral panel has reached a merely incorrect legal result—that is based upon an irrational application of a controlling legal principle—the court should not conduct an independent review of the factual record presented to the arbitral panel in order to achieve the "correct" result. In *Hardy,* as set forth above, an arbitral panel, which had provid-

ed no explanation of its award, found an employee, Skelly, to be secondarily liable "based upon the principles of respondeat superior," for primary acts of securities fraud committed by his fellow employee. 341 F.3d at 128. The district court, as did this Court, found this to be a patently illogical holding that could not be confirmed. The district court, however, conducted its own review of the evidentiary record and concluded that "a permissible view of the evidence" supported the conclusion that Skelly could be held primarily liable for securities fraud based upon his own conduct. *Id.* at 129 (quotation marks omitted). We held that the district court should not have undertaken such an assessment of the evidence:

> The district court correctly found that a court must "confirm [an arbitrator's] award if [it is] able to discern any colorable justification for the arbitrator's judgment, even if that reasoning would be based on an error of fact or law." *Westerbeke,* 304 F.3d at 212, n. 8. There may indeed be more than enough evidence in the record to find that Skelly should have been found primarily liable. But that is not what "the arbitrator's judgment" is in the instant case. The arbitrator's judgment is that Skelly was liable "upon the principles of respondeat superior," and no one points us to any evidence in the record that provides a colorable justification for this conclusion.

*Id.* at 131.

In sum, "the Second Circuit does not recognize manifest disregard of the evidence as proper ground for vacating an arbitrator's award." *Success Sys., Inc. v. Maddy Petroleum Equip., Inc.,* 316 F.Supp.2d 93, 94 (D.Conn.2004). We recognize only the doctrine of manifest disregard of the law, which doctrine holds that an arbitral panel's legal conclusions will be confirmed in all but those instances where

there is no colorable justification for a conclusion. To the extent that a federal court may look upon the evidentiary record of an arbitration proceeding at all, it may do so *only* for the purpose of discerning whether a colorable basis exists for the panel's award so as to assure that the award cannot be said to be the result of the panel's manifest disregard of the law. A federal court may not conduct a reassessment of the evidentiary record, as did the district court here, upon the principle that an arbitral award may be vacated when it "runs contrary to 'strong' evidence favoring the party bringing the motion to vacate" the award. *Wallace,* 239 F.Supp.2d at 392 (quoting *Halligan,* 148 F.3d at 202). Instead, whatever the weight of the evidence considered as a whole, "[i]f a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed." *Fahnestock & Co., Inc. v. Waltman,* 935 F.2d 512, 516 (2d Cir.1991) (internal quotation marks and citation omitted). Only this approach to the evidentiary record is consistent with the "great deference" which must be paid to arbitral panels by federal courts. *Duferco,* 333 F.3d at 388.

**B. Is the Award Supported by a Colorable Justification?**

**1. Control Person Liability.**

■ The Buttars alleged before the Panel that Wallace, Jacaruso, and Scotti were liable as control persons under both federal and North Carolina law. The district court acknowledged this, 239 F.Supp.2d at 395, but it made no finding as to whether the Buttars' claim under North Carolina law, at least as such law was presented to the Panel, provides a colorable justification for the Award. We find that it does and that the Award should therefore be confirmed. Having found that state law provides a colorable justifi-

cation of liability, we express no opinion as to whether federal law does as well.

Section 20 of the federal Securities and Exchange Act of 1934 provides for control person liability as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlled person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

North Carolina securities regulation statutes contain an analogous provision:

> Every person who directly or indirectly controls a person liable under subsection (a), (b) or (b1) of this section, every partner, officer, or director of the person, every person occupying a similar status or performing similar functions, and every dealer or salesman who materially aids in the sale is also liable jointly and severally with and to the same extent as the person, unless able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

N.C.G.S.A. § 78A–56(c)(1).

In their post-arbitration brief to the Panel, the Buttars, citing our opinion in *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996), stated that a prima facie case of control person liability under federal law requires a showing of "a primary violation by the controlled person, control of the primary violator by the targeted defendant, and that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." The Buttars argued, however, that North Carolina law is "broader" than federal law. While it may by the case under federal law that, as the district court put it, "the power to direct the management and policies of a person must be a real, *de facto* power and not just *de jure*," *Wallace*, 239 F.Supp.2d at 396, the Buttars argued before the Panel that this is not true under North Carolina law, stating as follows: "Under North Carolina law, controlling shareholders, officers and directors are control persons within the meaning of N.C.G.S.A. § 78A–56(c)(1), as a matter of law. *Waterman v. Alta Verde Industries, Inc.*, 643 F.Supp. 797, 809 (E.D.N.C.1986), *aff'd.*, 833 F.2d 1006 (4th Cir.1987)." Further, while the district court stated that Wallace, Jacaruso, and Scotti could not be liable as control persons under federal law unless "they were knowing participants in Winston's breaches of the securities laws," *Wallace*, 239 F.Supp.2d at 396, the Buttars told the Panel that North Carolina law is "more favorable" to plaintiffs. Specifically, the Buttars noted that § 78A–56(c)(1) states that control person liability can be imposed unless the defendant "in the exercise of reasonable care, could not have known" of the primary violator's fraudulent acts. This, they argued, "is the language of negligence. In other words, even if Jacaruso, Scotti and Wallace did not know of the fraud, they clearly were negligent in not knowing, and are jointly and severally liable as control persons under North Carolina law."

In their post-arbitration memorandum to the Panel, as already noted, Wallace, Jacaruso and Scotti take notice of the requirements of control person liability under federal law, but they make no statement whatsoever regarding control person liability under North Carolina law. That

is, they made no attempt to counter the Buttar's argument that North Carolina law is "more favorable" to plaintiffs. This was unwise on their part because, as we have stated, "under the test of manifest disregard [an arbitrator] is ordinarily assumed to be a blank slate *unless educated in the law by the parties*." *Goldman*, 306 F.3d at 1216 (emphasis added); *see also Duferco*, 333 F.3d at 390 ("In determining an arbitrator's awareness of the law, [courts should] impute only knowledge of governing law identified by the parties to the arbitration."); *Westerbeke*, 304 F.3d at 209 (explaining that manifest disregard of law test "look[s] to the knowledge actually possessed by the arbitrator"); *DiRussa*, 121 F.3d at 823 (rejecting the argument that the failure to award attorney's fees in case brought under federal age discrimination statute was in manifest disregard of the law, because party seeking fees told panel that he was *entitled* to fees, not that statute *required* that they be awarded); *Ahing v. Lehman Bros., Inc.*, No. 94 Civ. 9027, 2000 WL 460443 at *14 (S.D.N.Y. April 18, 2000) ("Because plaintiff has not shown that the arbitrators were aware of any clearly governing law precluding the panel from ordering plaintiff to pay half of the arbitrators' fees, their assessment of forum fees against her does not amount to manifest disregard of the law.").

If a party fails to identify governing law to an arbitrator, "we will infer knowledge and intentionality on the part of the arbitrator only if we find an error that is so obvious that it would be instantly perceived as such by the average person qualified to serve as an arbitrator." *Duferco*, 333 F.3d at 390. Thus, counsel forego their obligation to educate arbitral panels as to governing legal principles at their great peril. A motion to vacate an arbitral award because of manifest disregard of the law requires a showing that an arbitrator disregarded "a governing legal principle [that] is well-defined, explicit, and clearly applicable to the case, and [that] the arbitrator ignored it *after it was brought to the arbitrator's attention in a way that assures that the arbitrator knew its controlling nature*." *Goldman*, 306 F.3d at 1216 (emphasis added; citation and quotation marks omitted). Having made no attempt to educate the Panel as to North Carolina's control person statute, Wallace, Jacaruso, and Scotti certainly cannot make such a showing. Nor do they make any argument on this appeal that demonstrates that the Panel misapprehended North Carolina law to an extent that would be instantly recognizable to the average person qualified to serve as an arbitrator.

"We do not sit in judgment over the wisdom of [an] arbitrator's holdings." *Westerbeke*, 304 F.3d at 216. We do, however, review an arbitral panel's decision to assure that it rests upon "a barely colorable justification for the outcome reached." *Banco de Seguros del Estado*, 344 F.3d at 260 (citation and quotation marks omitted). We conclude that North Carolina's control person statute, as it was explained to the Panel, provides such a justification for the Award. First, the Buttars directed the Panel's attention to case law which holds that "controlling shareholders, officers and directors ... are ... 'control persons' within the meaning of N.C.G.S. § 78A–56(c)." *Waterman*, 643 F.Supp. at 809. As we have described, Wallace, Jacaruso, and Scotti are identified on numerous Securities and Exchange Commission filings as "control persons" of Montrose. Kavanagh testified that he directly informed Jacaruso of Winston's fraudulent activities and that he raised this same issue at numerous Montrose partner meetings. Collison, the Buttar's expert, opined that Jacaruso and Scotti, "as owners of the firm acquiesced, approved, sanctioned ... the activities of Mr. Winston." Wallace, Jaca-

ruso, and Scotti offered no expert testimony to counter Collison's opinion. Wallace testified that he "was in control of everybody performing their functions" at Montrose.

Considered as a whole, this evidence is sufficient to provide a colorable basis for control person liability under North Carolina law as that law was explained to the Panel by the parties. We therefore reject the contention of Wallace, Jacaruso, and Scotti that the Award was based on "the Panel's own brand of frontier justice without regard to the law or facts." Instead, we believe the Award is at least colorably based upon the facts and the law as presented to the Panel.

### 2. Liability for Punitive Damages.

The Award imposes joint and several liability against Winston, Wallace, Jacaruso, and Scotti for punitive damages in the amount of $604,805.00. The district court held that the Panel's imposition of punitive damages against Wallace, Jacaruso, and Scotti was based upon the doctrine of respondeat superior. This, the district court concluded, amounts to a manifest disregard of law because "the doctrine of respondeat superior imposes liability on the employer of those committing fraud in their employment. The entity that could have been held liable for Winston's fraud under the doctrine of respondeat superior was Montrose, Winston's employer." 239 F.Supp.2d at 394. We believe that this conclusion is incorrect because it fails to consider the law of punitive damages as it was presented to the Panel.

First, we note that the Award does not explicitly mention the doctrine of respondeat superior as the basis of the Panel's imposition of punitive damages as to Wallace, Jacaruso, and Scotti:

3. The Panel finds Respondent Winston liable for punitive damages based

upon the Panel's finding of fraud. The Panel finds the control persons, Respondents Wallace, Scotti and Jacaruso, liable for punitive damages based upon the Panel's finding of fraud. See *Hunt v. Miller,* 908 F.2d 1210, 1216 n. 15 (4th Cir.1990). "An employer is liable for an agent's fraud when committed within the scope of the agent's apparent authority, even when the principal did not know or authorize the commission of the fraudulent acts." Also, "a master is liable for punitive damages awarded when the servant or agent causing the injury was acting in the course and scope of the master's business." See also *Black's Law Dictionary,* 6th Ed.1991, 455ff.

As with the issue of control person liability, there is a considerable difference in the efforts made by the Buttars, on the one hand, and Wallace, Jacaruso, and Scotti, on the other, to educate the Panel as to the law of punitive damages. The Buttars provided the Panel with a copy of the *Hunt* opinion, in which the Fourth Circuit stated that "[p]unitive damages are not available under ... federal and North Carolina securities claims." 908 F.2d at 1216, n. 13. The Buttars further explained the law of punitive damages in their post-arbitration brief:

Under North Carolina law, a finding of fraud is sufficient to support an award of punitive damages, and an employer is liable for an agent's fraud when committed within the scope of the agent's apparent authority, "even when the principal did not know or authorize the commission of the fraudulent acts." *Hunt v. Miller,* 908 F.2d 1210, 1216 n. 15 (4th Cir.1990) (citing *Newton v. Standard Fire Ins. Co.,* 291 N.C. 105, 113–14, 229 S.E.2d 297, 302 (1976) and *Norburn v. Mackie,* 262 N.C. 16, 23, 136 S.E.2d 279, 284–85 (1964)).... In addition, a master is liable for punitive dam-

ages awarded when the servant or agent causing the injury was acting in the course and scope of the master's business." *Hunt v. Miller*, 908 F.2d 1210, 1216 (4th Cir.1990) (quoting *Mazza v. Medical Mut. Ins. Co.*, 311 N.C. 621, 627, 319 S.E.2d 217, 221 (1984)).

The North Carolina cases cited in *Hunt* leave no doubt about this Panel's authority to award punitive damages, or the liability of all Respondents for punitive damages. Winston is personally liable for punitive damages for his own fraud on the Buttars. Respondents Montrose, Jacaruso, Scotti, and Wallace are liable for punitive damages based upon the actions of their agents, Winston, Verma, and [Montrose broker John] Ferraro.

In contrast, Wallace, Jacaruso, and Scotti do not appear to have addressed the issue of punitive damages at all in their submissions to the Panel, and their argument as to the doctrine of respondeat superior is limited to the assertion in their reply memorandum that "the doctrine has been rendered irrelevant: by virtue of the District Court's December 7, 2001 order staying all further proceedings against Montrose, Montrose can not be held liable for the acts of its employees even if those acts are found to be injurious."

The shortcoming here is that Wallace, Jacaruso, and Scotti cite no evidence in the record which establishes that Winston's employer was Montrose alone, or that Winston could not be found to have acted as an agent of Wallace, Jacaruso, and Scotti. As already noted, Winston's status and responsibilities at Montrose are not entirely clear from the record. But the Panel had no argument before it to the effect that punitive damages could not be awarded against Wallace, Jacaruso, and Scotti because they did not have an employer-employee relationship with Winston, or be-

cause Winston could not be found to have acted as their agent.

Again, we do not sit in judgment of the wisdom of the Panel's imposition of punitive damages upon Wallace, Jacaruso, and Scotti. But we find no basis for holding that this portion of the Award was based on a manifest disregard of the law because, given the manner in which the law of punitive damages was presented to the Panel, we cannot find that they committed "an error so obvious that it would be instantly perceived as such by the average person qualified to serve as an arbitrator." *Duferco*, 333 F.3d at 390.

### 3. Liability for Fraud.

The district court found that, to the extent that the Award makes Wallace, Jacaruso, and Scotti primarily liable for securities fraud as co-conspirators with Winston, it manifestly disregards the law. 239 F.Supp.2d at 394–95. Because we have found that a colorable basis for the Award exists pursuant to North Carolina's control person statute, we have no need to consider this holding.

### C. Confirmation of the Award as to Winston.

Finally, the Buttars argue that the district court erred in declining to confirm the Award's finding of liability against Robert Winston. As already noted, Winston brought no action to vacate the Award and his time to do so has elapsed. *See* 9 U.S.C. § 12 (party must move to vacate, modify, or correct award within three months of the award's issuance). He has also filed no opposition to the Buttars' cross-motion to confirm the Award.

■ We have made clear that "a party may not raise a motion to vacate, modify or correct an arbitration award after the three month period has run, even when

raised as a defense to a motion to confirm." *Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 175 (2d Cir.1984). In their memorandum in support of their cross-motion to confirm the Award, the Buttars brought *Florasynth* to the attention of the district court, and argued that it required summary confirmation of the Award against Winston. (JA 181) The district court, however, did not confirm the Award as to Winston despite its statement that "[i]t is undisputed that Winston ... committed a primary violation of the securities law ...." *Wallace,* 239 F.Supp.2d at 395.

Winston was not a petitioner below, and he is not an appellee here. Indeed, it is unclear from the record whether the Buttars served Winston when they sought to have the Award confirmed. In its opinion, the district court made no statement as to whether the Award against Winston should be confirmed. Nevertheless, the Buttars' cross-motion below sought confirmation of the Award in full. In addition to granting appellees' motions to vacate, the district court denied the Buttars' cross-motion to confirm. Thus, the district court, at least implicitly, denied the cross-motion to confirm not merely as to appellees, but also as to Winston. To the extent that this is so, the district court erred. On remand, the district court should explicitly address the issue of the Award as it relates to Winston, and either confirm the Award as to him or explain why it is unnecessary or inappropriate to do so.

## CONCLUSION

The decision of the district court is reversed. We remand the case for the entry of an order confirming the Award as to Wallace, Jacaruso, and Scotti and for consideration of the Award as to Winston.