GOLDMAN SACHS EXECUTION & CLEARING, L.P. (f/k/a Spear, Leeds & Kellogg, L.P.), Petitioner,

v.

The OFFICIAL UNSECURED CREDITORS' COMMITTEE OF BAYOU GROUP, LLC, et al., on behalf of Bayou Group, LLC, Bayou Management, LLC, Bayou Advisors, LLC, Bayou Equities, LLC, Bayou Fund, LLC, Bayou Superfund, LLC, Bayou No Leverage Fund, LLC, Bayou Affiliates Fund, LLC, and Bayou Accredited Fund, LLC, Respondent.

No. 10 Civ. 5622 (JSR).

United States District Court, S.D. New York.

Nov. 30, 2010.

Eric Andrew Bensky, Howard Schiffman, Schulte, Roth & Zabel LLP, Washington, DC, for Petitioner.

John G. Rich, Ross Bryan Intelisano, Rich & Intelisano, LLP, Daniel Allan McLaughlin, Sidley Austin LLP, New York, NY, for Respondent.

## OPINION AND ORDER

JED S. RAKOFF, District Judge.

Although arbitration is touted as a quick and cheap alternative to litigation, experience suggests that it can be slow and expensive. But it does have these "advantages": unlike courts, arbitrators do not have to give reasons for their decisions, and their decisions are essentially unappealable. Here, petitioner Goldman Sachs Execution & Clearing, L.P. ("Goldman Sachs"), having voluntarily chosen to avail itself of this wondrous alternative to the rule of reason, must suffer the consequences.

Goldman Sachs brings this petition to vacate the $20,580,514.52 arbitration award granted in favor of respondent The Official Unsecured Creditors' Committee on Behalf of Bayou Group, LLC (the "Creditors' Committee") in the matter of *The Official Unsecured Creditors' Committee of Bayou Group, LLC, et al. against Goldman Sachs Execution & Clearing, L.P. and Spear, Leeds & Kellogg, L.P.*, FINRA Dispute Resolution Arbitration No. 08–01763 (June 22, 2010). The Creditors' Committee cross–petitions to confirm the award. Although the arbitration panel did not articulate its reasoning—nor was it required to do so—petitioner argues that in rendering the award, the panel "manifestly disregarded the law" and exceeded its authority under the Federal Arbitration Act. By Order dated November 8, 2010, the Court

denied the petition. This Opinion and Order states the reasons for the Court's ruling—because, a court, unlike an arbitrator, must state its reasons and subject them to appellate scrutiny.

▆ The Federal Arbitration Act provides that a district court may vacate an arbitration award "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators . . .; (3) where the arbitrators were guilty of misconduct . . .; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made." 9 U.S.C. § 10(a). Although the statute makes no mention of "manifest disregard of the law" as a basis for vacatur, some courts previously construed the fourth ground as a warrant for vacating awards on the basis of such disregard. Other courts, concerned that arbitration would otherwise be entirely untethered to the rule of law, simply concluded, by way of judicial legislation, that "manifest disregard" constituted an independent, fifth ground for vacatur. Subsequently, however, the Supreme Court made "clear" that such approaches were either eliminated by the Court's decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 586, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008)—or not. As the Court so helpfully stated last term in *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* —— U.S. ——, 130 S.Ct. 1758, 1768 n. 3, 176 L.Ed.2d 605 (2010), "[w]e do not decide whether 'manifest disregard' survives our decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 585, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10." Nonetheless, the Second Circuit, divining clarity where others see only confusion, "concluded that manifest disregard 'remains a valid ground for vacating arbitration awards.'" *T. Co Metals, LLC v. Dempsey Pipe & Supply, Inc.,* 592 F.3d 329, 340 (2d Cir.2010) (quoting *Stolt–Nielsen SA v. AnimalFeeds Int'l Corp.,* 548 F.3d 85, 94 (2d Cir.2008)).

▆ As a practical matter, the putative survival of the manifest disregard standard will be of little solace to those parties who, having willingly chosen to submit to inarticulated arbitration, are mystified by the result; for a party seeking vacatur on the basis of manifest disregard of the law "must clear a high hurdle," *Stolt–Nielsen,* 130 S.Ct. at 1767. Indeed, vacatur on this basis can succeed only in "those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,* 333 F.3d 383, 389 (2d Cir.2003). Conversely, the award must be enforced "if there is a barely colorable justification for the outcome reached." *Wallace v. Buttar,* 378 F.3d 182, 190 (2d Cir.2004) (quotation mark and citation omitted). Moreover, the facts of record must be construed most favorably to the prevailing party and the arbitration panel's implicit factual findings are not subject to any review whatsoever. *Id.* at 193.

▆ In determining whether a petitioner has carried this exceedingly heavy burden for invoking the doctrine of manifest disregard, the Second Circuit has recognized three factors a district court must consider. First, the court must determine "whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators." *Duferco,* 333 F.3d at 390. Second, if the law is clear and plainly applicable, the court must find that the law "was in fact improperly applied, leading to an erroneous outcome." *Id.* Finally, the court must

look to a "subjective element, that is, the knowledge actually possessed by the arbitrators. In order to intentionally disregard the law, the arbitrator must have known of its existence, and its applicability to the problem before him," *Id.* Thus, the award must be upheld unless the arbitration panel intentionally and erroneously disregarded a clear and plainly applicable law. This is to be determined, moreover, by reference to a record where the arbitration panel typically, as here, states neither its findings of fact nor its conclusions of law.

With these rigorous requirements in mind, the Court now turns to the particulars of this case. The events precipitating the underlying dispute began in 1999, when the Bayou Group, LLC opened at Goldman Sachs the account of Bayou Fund, LLC, a hedge fund managed by Samuel Israel. In 2003, Israel opened similar accounts at Goldman Sachs for four new hedge funds in the Bayou family— Bayou Superfund LLC, Bayou Accredited Fund LLC, Bayou Affiliates Fund LLC, and Bayou No Leverage Fund LLC (collectively, along with Bayou Fund, LLC, the "Bayou Funds"). All of these accounts were opened pursuant to Goldman Sach's standard account agreements.

On March 5, 2003 Israel directed Goldman Sachs to internally transfer through journal entries a total of $13,866,70.78 from the Bayou Fund, LLC margin account to the margin accounts of the four new hedge funds. A second group of transfers occurred between June 2004 and the filing of Bayou's bankruptcy petition in May, 2006, and consisted of deposits of $6,693,754 from an outside entity, Bayou Group, into the Bayou Funds' margin accounts at Goldman Sachs.

Israel closed the hedge funds in August 2005, and soon afterwards it was discovered that he had been fraudulently concealing trading losses from the hedge funds' investors and operating a Ponzi scheme. Israel and two other executives subsequently pled guilty to criminal charges and are now incarcerated. The funds were placed into receivership, and on May 30, 2006, the Bayou Funds filed voluntary petitions for relief in the Southern District of New York under Chapter 11 of the United States Bankruptcy Code. On June 15, 2006, the Creditors' Committee was appointed to represent the interests of the funds' unsecured creditors, and on May 29, 2008 the Bankruptcy Court granted the Creditors' Committee's motion to commence an adversary proceeding against Goldman Sachs in the Bankruptcy Court, alleging that the aforementioned transfers served to defraud Bayou's creditors and that Goldman Sachs, because of its failure to diligently investigate the funds, was jointly and severally liable, along with the Bayou Funds, for fraudulent transfers and fraudulent conveyances. Pursuant to the terms of the Goldman Sachs' agreements governing the Bayou Funds' accounts, the adversary proceeding was then stayed, on consent, in favor of the FINRA arbitration.

On June 27, 2010, the arbitration panel—consisting of three very experienced arbitrators—awarded the Creditors' Committee the full $ 20,580,514.52 it sought from Goldman Sachs, comprising the total of all the aforementioned transfers. Although, as noted, the panel gave no reasons for its decision, nonetheless, based on the record before the panel, it may be inferred that the panel found that: (1) the March 5, 2003 transfers of $ 13,886,760.78 from the Bayou Fund, LLC account at Goldman Sachs to the four new hedge fund accounts at Goldman Sachs constituted fraudulent conveyances under New York law; and (2) that the nineteen deposits totaling $6,693,754 from Bayou Group,

LLC into the Bayou Funds' accounts at Goldman Sachs between June 2004 and May 2005 were fraudulent transfers under federal bankruptcy law.

With respect to the first group of transfers, Goldman Sachs maintains that the law is clear that fraudulent conveyance claims under New York Debtor Creditor Law §§ 273–76 cannot be based on movements of money between "ostensibly separate entities that in actuality are one and the same [,] because such movements effect no conveyances at all." Goldman Sachs Petition at 18. Thus, it argues, the transfers of almost $13.9 million made among the various Bayou Funds accounts at Goldman Sachs cannot be considered fraudulent conveyances.

■ However, the two cases Goldman Sachs cites in support of this theory are hardly dispositive. *See B.W. Dyer & Co. v. Monitz, Wallack & Colodney,* 16 Misc.2d 1033, 1041–42, 184 N.Y.S.2d 445 (N.Y.Sup. Ct.1959), *aff'd in part, modified in part on other grounds,* 12 A.D.2d 594, 208 N.Y.S.2d 498 (N.Y.App.Div.1960), *aff'd,* 11 N.Y.2d 654, 225 N.Y.S.2d 506, 180 N.E.2d 796 (1962); *Feltman v. Gulf Bank (In re Sophisticated Communications, Inc.),* No. 00–17635–BKC–RAM, Slip Op. at 6 (Bankr.S.D.Fla. Oct. 1, 2003). *Dyer* was expressly limited to the facts of that case and has not been cited with approval by any other court. *Feltman,* a case from the Bankruptcy Court of the Southern District of Florida, is not controlling authority here.[1] Moreover, both cases involved situations where corporate formalities were not observed, so that the various entities involved could reasonably be viewed as one. Here, by contrast, petitioner's argument merely begs a factual question submitted to the arbitrators for determination: *viz.,* whether the Bayou Funds are in actuality one and the same entity. *See* Creditors' Committee Petition at 8. Given the fact that Goldman Sachs itself required that each Bayou fund be legally separate and adhere to all corporate formalities, the panel could certainly find that each of the Bayou funds was a legally separate entity, in which event the cases cited by Goldman Sachs would be irrelevant. Thus, Goldman Sachs's suggestion that the decision of the arbitration panel with respect to the first set of transfers was in manifest disregard of the law is, in reality, a quarrel with the arbitration panel's likely factual finding, from which no appeal may be taken.

With respect to the second set of transfers, the arbitration panel seemingly concluded that Goldman Sachs, as an "initial transferee" of the fraudulently-obtained funds that Bayou Group transferred into the Goldman Sachs accounts between June 2004 and May 2005, was liable to the defrauded creditors because Goldman Sachs did not diligently investigate Bayou's fraudulent practices. Goldman Sachs, however, argues that the arbitration panel manifestly disregarded "universal" case law under the Bankruptcy Code that a clearing and execution firm in the position that Goldman Sachs held in relation to Bayou can be liable as an "initial transferee" only if it acquired "dominion and control" over the transferred assets at the time of transfer. *See* Goldman Sachs Petition at 10 (citing 11 U.S.C. §§ 544, 550(a)). In support of this proposition, Goldman Sachs points to what it characterizes as an unbroken line of precedent beginning with *Bonded Financial Services v. European American Bank,* 838 F.2d 890 (7th Cir. 1988), and including *Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey),* 130 F.3d 52 (2d Cir.1997); *Nordberg v. Societe Generale*

---

1. New York law governs the state law claims here at issue.

*(In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir.1988); and *Kaiser Steel Res., Inc. v. Jacobs (In re Kaiser Steel Corp.)*, 110 B.R. 514 (D.Colo.1990), *aff'd on other grounds*, 913 F.2d 846 (10th Cir. 1990). Under petitioner's reading of these cases, Goldman Sachs is a "mere conduit" that cannot be held liable as an initial transferee.

But the most recent case on point in this District,[2] *Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund, Ltd.)*, 397 B.R. 1 (S.D.N.Y.2007), cuts in favor of the Creditors' Committee and against Goldman Sachs. In *Gredd*, as here, the debtor was a hedge fund involved in a Ponzi scheme that deposited monies into a margin account at Bear, Stearns Securities Corp. ("Bear Stearns"). Helen Gredd, the bankruptcy trustee for the hedge fund, sought to recover from Bear Stearns the amount of the transfers into the margin account, on the ground that Bear Stearns had failed to diligently investigate the fraudulent nature of the hedge fund and was therefore liable as an "initial transferee" of fraudulently obtained funds. *Gredd* at 14, 22–24. The Bankruptcy Court agreed, *id.* at 14, and the District Court, in a careful opinion by the Hon. Naomi Reice Buchwald, affirmed this determination. Among other things, Judge Buchwald distinguished the only Second Circuit case on which Goldman Sachs here relies, *In re Finley*, because, *inter alia*, "the degree of decision-making control Bear Stearns possessed with respect to the funds demonstrates a level of 'dominion and control' sufficient to create transferee liability." *Id.* at 21.

In the instant case, the Creditors' Committee presented the arbitration panel with considerable evidence that Goldman

Sachs' customer agreements with the Bayou Funds gave Goldman Sachs broad discretion over use of the monies and securities held in the Bayou Funds' accounts. *See, e.g.,* Creditors' Committee Statement of Claim ¶¶ 32–33. Although Goldman Sachs argued to the contrary, a reasonable arbitrator could well have found that such rights enjoyed by Goldman Sachs with respect to the Bayou Funds' accounts gave it sufficient dominion and control to create transferee liability. Given such putative findings, the arbitration panel could then rightly apply the legal principles set forth in *Gredd* to impose transferee liability on Goldman Sachs. The suggestion that this somehow constitutes "manifest disregard of the law" is therefore entirely misplaced, for, once again, the heart of the decision is a factual finding.

Finally, Goldman Sachs argues that it is entitled to receive credit for monies it effectively "returned" to the debtor. It cites three cases in support of its argument that fraudulent transfer defendants receive credit for amounts they effectively return to the debtor pre-petition. *See Bakst v. Sawran (In re Sawran)*, 359 B.R. 348, 353, 354 (Bankr.S.D.Fla.2007); *Bakst v. Wetzel (In re Kingsley)*, Adv. No. 06–2109–BKC–PGH–A, 2007 WL 1491188, at *4–*5 (Bankr.S.D.Fla. May 17, 2007); *Dahar v. Jackson (In re Jackson)*, 318 B.R. 5, 27–28 (Bankr.D.N.H.2004).

However, these cases are not controlling in this District and are, in any case, distinguishable on the facts. They all involve transfers to a family member by an individual debtor who was rendered insolvent by the transfers or was facing personal bankruptcy. Moreover, in each case the transferees submitted an accounting to the

---

2. The FINRA arbitration panel, sitting in Manhattan, necessarily applied the law of the Southern District of New York to the bank-ruptcy claims that were filed in the Bankruptcy Court for the Southern District of New York.

court demonstrating that the funds actually had been returned to the debtor and that the transferee had not benefitted from the transfer. Additionally, in *In re Sawran*, the court expressly found that "[i]n holding that the Defendants are entitled to an equitable credit in the amount of transfers made prepetition to the Debtor, the Court finds that the Defendants are innocent of wrongdoing and deserve protection under these circumstances." 359 B.R. at 354.

 In the instant case, the accounting is far more complex than in the cases Goldman Sachs cites.[3] The arbitration panel did not "manifestly disregard the law" if, as is likely, it made a factual determination that Goldman Sachs had not proved the funds were returned on a dollar-for-dollar basis to the debtors. Moreover, implicit in all the arbitration panel's determinations is the finding that Goldman Sachs, far from being totally innocent of wrongdoing, failed to engage in the diligent investigation that would have revealed Bayou's fraud. This is especially relevant to application of the double recovery theory, which is based on principles of equity that a court (or in this case the arbitration panel) may apply (or not apply) with considerable discretion.

The Court has considered Goldman Sachs' other arguments and finds that none of them remotely suggests that the arbitration panel manifestly disregarded the law in granting the 20,580,514.52 award in favor of the Creditors' Committee. Accordingly, the Clerk of the Court is directed to enter final judgment dismissing Goldman Sachs' petition to vacate the arbitration award and granting the Creditors' Committee's cross-petition to confirm the award in its entirety.

SO ORDERED.

---

3. Goldman Sachs' "double-recovery" argument is based on the fact that after the Bayou Funds transferred $13.9 million to the four new Bayou Funds' separate accounts on March 5, 2003, the five Bayou Funds collectively withdrew $198 million from 2003 through 2005. Also during the June 2004 through June 2005 period when the Bayou Funds deposited the $6.7 million, those same Bayou Funds withdrew more than $26 million. While the Creditors' Committee concedes that this is true, it points out that the Bayou Funds also collectively received over $219 million in deposits, purchased over $15 billion worth of securities, and lost over $42 million trading during that time period. The Creditors' Committee also notes that it is impossible to trace what was done with the deposits of $13.9 million and $6.7 million. *See* Goldman Sachs Petition at 22–25; Creditors' Committee Petition at 30–33.