06-1893-cv, 06-5617-cv
Zeiler v. Deitsch

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2006

Heard: May 14, 2007                    Decided: August 23, 2007

Docket Nos. 06-1893-cv, 06-5617-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - -
MAYER ZEILER, FLOCKTEX INDUSTRIES LTD.,
DE-LUX INDUSTRIES and ACHIM DEITSCH TEXTILE
INDUSTRIES,
     Plaintiffs-Counter-Defendants-
     Appellees,

                    v.

JOSEPH DEITSCH, MORDECAI DEITSCH, JACOB PINSON,
RACHEL SANDMAN, DEITSCH PLASTIC COMPANY,
DEITSCH PLASTIC PARTNERS, DEITSCH INTERNATIONAL
SALES CORP., SHALVAH PARTNERSHIP, OLDE POINTE
ASSOCIATED LIMITED PARTNERSHIP, ATC PARTNER-
SHIP, ESDEE REALTY, ORANGE INVESTMENT COMPANY,
WILLOWBROOK VENTURE COMPANY, ANNASH, INC. and
GREENDEER,
     Defendants-Counterclaimants-Appellants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, MINER and KATZMANN, Circuit Judges.

     Appeals from the March 22, 2006, judgment and November 9, 2006,

order of the United States District Court for the Eastern District of

New York (Sandra L. Townes, District Judge), vacating, in No. 06-1893,

arbitral awards made by a panel of Jewish rabbis because a panel

member resigned, and confirming the full panel's previous accounting awards, and enforcing, in No. 06-5617, the judgment that had confirmed the accounting awards.

No. 06-1893 reversed in part, affirmed in part, and remanded; No. 06-5617 affirmed.

Nathan Lewin, Wash., D.C. (Alyza D. Lewin, Lewin & Lewin, LLP, Wash., D.C.; Thomas A. Kissane, Schlam Stone & Dolan, LLP, New York, N.Y., on the brief), for Defendants-Counterclaimants-Appellants.

Leslie A. Lupert, New York, N.Y. (Sarah P. Karwan, Orans, Elsen & Lupert LLP, New York, N.Y., on the brief), for Plaintiffs-Counter-Defendants-Appellees.

JON O. NEWMAN, Circuit Judge.

The primary issue on the first of these two appeals, which were heard in tandem, is the narrow question of whether, in the circumstances of this case, an arbitration panel composed of three rabbis can proceed to make an award after one member has resigned from the panel. The second appeal concerns the validity of a court order enforcing a judgment that confirmed the three-member panel's earlier awards requiring accountings. These matters arise on an appeal in No. 06-1893 from a judgment of the United States District Court for the Eastern District of New York (Sandra L. Townes, District Judge)

-2-

vacating the two-member panel's arbitration awards and confirming eight accounting awards previously made by the full three-member panel and an appeal in No. 06-5617, from an order enforcing the District Court's judgment with respect to the accounting awards. We conclude that the arbitration panel was entitled to continue after one member's resignation, that the accounting awards were properly confirmed, and that the enforcement order was properly entered. In No. 06-1893, we reverse the District Court's judgment in part, affirm in part, and remand, and in No. 06-5617, we affirm.

## Background

Facts. A somewhat detailed account of the facts is required. Plaintiff-Appellee Mayer Zeiler ("Zeiler") and Defendants-Appellants Joseph Deitsch, Mordecai Deitsch, Jacob Pinson, and Rachel Sandman (collectively "Deitsch") all belong to the Jewish-Orthodox Deitsch family. Zeiler resides in Israel, and Deitsch resides in the United States. They have jointly owned various assets in both the United States and Israel. Plaintiffs-Appellees Flocktex Industries Ltd., De-Lux Industries, and Achim Deitsch Textile Industries are three Israeli corporations that were jointly owned by Zeiler and Deitsch ("Israeli companies"). Defendants-Appellants Deitsch Plastic Co., Deitsch Plastic Partners, Deitsch International Sales Corp., and Annash, Inc.

-3-

are U.S. corporations that were also owned jointly by Zeiler and Deitsch ("U.S. companies"). Defendants Shalvah Partnership, Olde Pointe Associated Limited Partnership, ATC Partnership, Esdee Realty, Orange Investment Co., Willowbrook Venture Co., Annash, Inc., and Greendeer are real estate entities located in various states in the United States, which are owned jointly by Zeiler and Deitsch ("U.S. real estate").

In the late 1990s, Zeiler and Deitsch decided to sever much of their business relations by dividing the jointly owned assets between them. Due to the complexity of the issues and the various disputes involved in making the division, the parties decided to submit their dispute to arbitration. They agreed that arbitration would occur before a "Beth Din," which is a Jewish religious tribunal comprising three rabbis.

The parties agreed to appoint the members of the Beth Din according to the method known in Jewish law as "Zabla," in which each party elects one arbitrator, and the two appointed arbitrators then pick a third neutral arbitrator as the presiding member of the panel.[1]

_____

[1]"Zabla" is the pronunciation of an acronym for the Hebrew words "Ze Borer Lo Echad" (substituting capital "E" for the letter "aleph" with its diacritical mark, signifying the sound of an "e"); the phrase

-4-

Zeiler appointed Rabbi Moshe Tendler, Deitsch appointed Rabbi Moshe Bogomilsky, and Rabbis Tendler and Bogomilsky selected Rabbi Shmuel Gurwitz as the presiding arbitrator.

After the appointment of the panel, the parties signed, on August 22, 1999, a formal arbitration agreement--a concise, standard-form contract in traditional Hebrew entitled "Arbitration Deed" ("1999 Arbitration Agreement").[2] The 1999 Arbitration Agreement stated, in pertinent part, the willingness of the parties to seek resolution of all their disputes by a Beth Din consisting of Rabbis Tendler, Bogomilsky, and Gurwitz, who were to arbitrate the case according to Jewish law. The arbitrators were authorized to enter interim and final awards and to reach decisions by vote of a majority of the

roughly translates as "each picks his one."

[2] The District Court encountered an insignificant confusion regarding the exact date of the signing: the Agreement stated only the Hebrew calendar date, 10 Ellul 5759, which was in fact August 22, 1999. The translation supplied to the District Court, however, mentioned the incorrect date September 22, 1999, and subsequent documents filed by the parties apparently echoed that mistake. The District Court therefore referred to the Agreement as the "September 1999 agreement."

members of the panel.

In September 1999, following several arbitration sessions, the panel entered a framework decision in which it adopted the parties' agreement to sever their commercial connections by granting Zeiler full ownership of the Israeli companies and Deitsch full ownership of the U.S. companies, while retaining joint ownership of the U.S. real estate ("1999 Decision"). The decision then set out a general plan according to which the dissolution of the partnership and the division of the assets would take place. The 1999 Decision also required the parties to jointly shoulder, in relative shares, the tax obligations incurred by the U.S. and Israeli companies until the end of 1997;[3] and that Zeiler should receive "a full and accurate listing" of the jointly owned real estate and additional information regarding his pension and insurance rights in the U.S. companies. Finally, the Beth Din ordered that a detailed contract be prepared based on the principles set out in the decision.

From 1999 to 2003 the parties engaged in extensive negotiations

---

[3]Since Zeiler owned 1/6 of the joint assets, his relative tax liability was 1/6 of the full amount paid by the partners. The arrangement regarding the tax liability was reiterated in a ruling of the Beth Din in June 2001.

in order to implement the 1999 Decision. As various disputes arose along the way, the parties returned to the arbitration panel which in turn entered various detailed decisions. Six such decisions, handed down between July 2000 and April 2003, required, among other things, that Deitsch provide Zeiler with an accounting regarding the U.S. real estate entities, which are jointly owned by the parties but effectively controlled by Deitsch.[4] The parties disagree as to whether all these orders, along with a similar provision in the 1999 Decision

_____

[4]More specifically, a decision of July 3, 2000, provided that "Zeiler is entitled to an accounting and payment of all income due him" from the U.S. real estate; a decision of July 6, 2000, ordered Deitsch "to provide Zeiler with a complete accounting of his real estate investments, with documentation for the past five years"; a decision of June 24, 2001, provided that "Zeiler should immediately be given all the real estate information as indicated in the previous [orders]"; a decision of May 14, 2002, stated that "Mr. Zeiler, or his representative, has the right to review the books of the American real estate partnerships"; a decision of March 4, 2003, required the parties to follow the directives of an appointed accountant regarding Zeiler's request for information; and a decision of April 28, 2003, literally reiterated the previous order.

and a subsequent order in February 2004, regarding Zeiler's life insurance policies (collectively, the "accounting orders"), were fully complied with (as Deitsch contends) or not (as Zeiler contends).

In June 2003, a comprehensive agreement entitled "Shares Sales Agreement" was finally signed by the parties ("2003 Agreement"). The 2003 Agreement implemented the general guidelines of the 1999 Decision and the subsequent orders of the arbitration panel. It specified the details of both parties' obligations, which would lead to splitting the ownership of the Israeli and U.S. companies--mostly, reciprocal transfers of funds, shares, and documents. Among its many provisions, the 2003 Agreement reiterated Zeiler's obligation to pay his relative share (1/6) of tax obligations. The 2003 Agreement also required Deitsch to provide Zeiler with documents regarding the U.S. real estate and Zeiler's pension and insurance rights in the U.S. companies. Lastly, the 2003 Agreement stated:

> [T]his Agreement shall be governed and construed
> pursuant to the Torah law,[5] and the Beth Din

---

[5]"Torah law" and "Halachic law" are the formal terms for the body of law sometimes referred to in English as "Jewish law." See http://en.wikipedia.org/wiki/Jewish_law ("Halakha") (last visited August 1, 2007). Jewish law is not to be confused with "Israeli law,"

-8-

shall have exclusive jurisdiction in connection herewith.

"Beth Din" is defined in the 2003 Agreement as:

a judicial tribunal governed by Halachic law, the members of which are the honorable Rabbi Moshe D. Tendler, Rabbi Shmuel C. Gurwitz and Rabbi Moshe Bogomilski, or any other tribunal governed by Halachic law upon which the Parties mutually agree[.]

As the 2003 Agreement was being implemented, another dispute arose between the parties, this time regarding the amount of Zeiler's share of the taxes paid by Deitsch to the I.R.S. In December 2003 Deitsch filed with Zeiler a reimbursement demand for 1/6 of the taxes allegedly paid by Deitsch, an amount of nearly $800,000. In April 2004, Zeiler sent a letter to the three arbitrators in which he contested Deitsch's demand on the basis of lack of credible documentation. Five days later, and before the Beth Din considered this dispute, Rabbi Tendler, the arbitrator appointed by Zeiler, resigned from the Beth Din. In two letters sent to Rabbi Gurwitz, Rabbi Tendler accused Rabbi Gurwitz of failing to compel Deitsch to abide by the accounting orders, and claimed that Rabbi Bogomilsky (the arbitrator appointed by Deitsch) was biased.

Following Rabbi Tendler's resignation, the two remaining

---

the body of law governing in Israel.

-9-

arbitrators, Rabbis Gurwitz and Bogomilsky, entered a decision on May 7, 2004, stating that under Jewish law and in accordance with the 1999 Arbitration Agreement they retained authority over the arbitration. In a letter sent to an Israeli rabbi, Rabbis Gurwitz and Bogomilsky detailed the authorities in Jewish law on which they had based their decision to retain jurisdiction. Their reasoning was based primarily on the fact that the substantive issue--Zeiler's 1/6 share in the joint tax liability--had already been decided by the three arbitrators in 2001, so the remaining dispute concerned only the amount of money to be paid under that liability. In addition, the arbitrators mentioned the 1999 Arbitration Agreement's authorization to decide issues by a majority vote. Rabbis Gurwitz and Bogomilsky then issued a letter to the parties scheduling a session of the arbitration panel to hear argument on the tax dispute.

In response, Zeiler declared that because the panel had lost one of its members, "the Beth Din, as previously constituted, no longer exists and it is for the parties to decide henceforth with regards to a newly constituted Beth Din." Zeiler added that he would not appear before the two-member panel.

Rabbis Gurwitz and Bogomilsky denied Zeiler's objections and conducted the session, at which only Deitsch appeared, presenting

evidence regarding the amount of money he had paid in U.S. taxes and seeking reimbursement of Zeiler's share. On June 16, 2004, Rabbis Gurwitz and Bogomilsky entered a decision ordering Zeiler to pay Deitsch $794,145.16--his share of the taxes that Deitsch proved he had paid to the I.R.S. for earnings prior to the end of 1997. The June 16, 2004, decision briefly considered the claims included in Zeiler's letter contesting the tax liability, but denied them.

The litigation. In August 2004, Zeiler and the Israeli companies filed a petition in New York Supreme Court, which Deitsch removed to the District Court. Zeiler asked the Court to vacate the two-member panel's decisions of May 7, 2004 (retaining jurisdiction), and June 16, 2004 (imposing the nearly $800,000 liability). Zeiler also asked the Court to confirm the eight accounting orders previously entered by the three-member panel between 1999 and 2004. In an almost symmetrical counter-petition, Deitsch and the U.S. companies sought confirmation of the June 16, 2004, award and vacation of the eight accounting orders.

On March 22, 2006, the District Court entered a judgment granting all aspects of Zeiler's petition--vacating the May 7, 2004, and June 16, 2004, decisions and confirming the eight accounting orders. Due to the varying nationalities of the parties and the locations of the

-11-

assets involved, the Court applied the standards for confirmation set by Chapter 2 of the Federal Arbitration Act ("FAA"), which incorporated the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958, 9 U.S.C. §§ 201-08, 21 U.S.T. 2517 ("Convention"). See Zeiler v. Deitsch, No. 04-3602 (E.D.N.Y. March 22, 2006). Deitsch appeals both aspects of the District Court's judgment in No. 06-1893.

After entry of the March 22, 2006, judgment, Zeiler filed a motion with the District Court to enforce the judgment that had confirmed the accounting orders. Zeiler's enforcement motion specifically asked the Court to order Deitsch to provide Zeiler with "an accounting for the years 1995 to the present within ten (10) days for the [U.S. real estate]." On October 27, 2006, Judge Townes granted "in all respects" Zeiler's motion to enforce the accounting orders. An order to that effect was entered on November 9, 2006.

In December 2006, this Court granted Deitsch's motion for a stay of the District Court's enforcement order. See Zeiler v. Deitsch, No. 06-1893 (2d Cir. Dec. 6, 2006). Deitsch then filed a second notice of appeal, this time appealing the District Court's enforcement order of November 9, 2006. Deitsch claims that the enforcement decision has broadened the scope of his accounting obligations, compared to the

-12-

language of the eight accounting orders entered by the arbitration panel and previously confirmed by the District Court. We consider this second appeal, No. 06-5617, along with the appeal from the Court's March 22, 2006, judgment.

## Discussion

### I. Applicable Principles

"Where a district court denies confirmation of an arbitral award, we review its findings of fact for clear error, and its conclusions of law de novo." Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc., 403 F.3d 85, 89 (2d Cir. 2005). Similarly, "[w]e review a district court's decision to confirm an arbitration award de novo to the extent it turns on legal questions, and we review any findings of fact for clear error." Duferco International Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 388 (2d Cir. 2003). In a case governed by the Convention, "[t]he party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies. Art. V(1). The burden is a heavy one, as the showing required to avoid summary confirmance is high." Encyclopaedia, 403 F.3d at 90 (internal quotation marks and citation omitted).

The facts of the case support the District Court's assumption

-13-

that, even though the arbitration took place in New York, it should be considered a non-domestic arbitration for the purposes of the FAA, and therefore covered by the Convention. Some of the assets that were the subject of the arbitration are located in Israel, and some of the parties reside there. The law chosen to govern the arbitration is based on a foreign system. The commercial transactions decided in the arbitration have a clear international character. See Convention, art. I(1) (The Convention applies to "arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought."); 9 U.S.C. § 202 ("An agreement or award arising out of [a commercial] relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states."); Bergesen v. Joseph Muller Corp., 710 F.2d 928, 932-33 (2d Cir. 1983) (both the Convention and section 202 authorize United States courts to enforce under the Convention non-domestic awards entered in the United States); Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 19 (2d Cir. 1997) (awards become subject to the Convention "not because made abroad, but because made within the legal framework of another

-14-

country, e.g., pronounced in accordance with foreign law or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction" (quoting Bergesen, 710 F.2d at 932)).

Judicial confirmation of the arbitration awards in the pending case is therefore initially governed by the provisions of chapter 2 of the FAA, 9 U.S.C. §§ 201-08, and by the Convention, 21 U.S.T. 2517, as incorporated in the FAA. However, since the arbitration took place in the United States, the awards entered by the Beth Din are at the same time subject to the FAA provisions governing domestic arbitration awards. See Convention, art. V(1)(e); Yusuf, 126 F.3d at 21-23; Sole Resort, S.A. de C.V. v. Allure Resorts Management, LLC, 450 F.3d 100, 102 n.1 (2d Cir. 2006); Jacada, Ltd. v. International Marketing Strategies, Inc., 401 F.3d 701, 709 (6th Cir. 2005). It appears that the District Court did not consider the import of the FAA's "domestic" provisions, instead applying solely the Convention's grounds of review. However, as will be discussed in more detail below, we conclude that such an additional analysis would have had no practical effect on the matters before us.

The power of a district court to confirm a non-domestic arbitration award under the Convention is stated in 9 U.S.C. § 207:

> Within three years after an arbitral award falling under the Convention is made, any party

-15-

to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

Article V of the Convention stipulates the bases for denying confirmation of an arbitral award. It reads, in relevant part:

> (1) Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
>
> . . . .
>
>> (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or
>>
>> (e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

Applying these provisions, the District Court ordered the two decisions entered by Rabbis Gurwitz and Bogomilsky vacated, and confirmed the eight accounting orders entered by all three arbitrators prior to Rabbi Tendler's resignation. We consider each of these decisions separately.

-16-

II.  Composition of the Arbitration Panel

The District Court ruled that the 2003 Agreement explicitly required that the arbitration panel consist of the three named rabbis and that the 2003 Agreement did not authorize any two of them to continue the arbitration in the absence of the third.  The Court therefore granted Zeiler's petition to vacate the two decisions entered by only two members of the panel.[6]  The Court relied on

---

[6]In vacating the two awards, rather than merely refusing to confirm them, the District Court seems to have briefly recognized its double role, both as a confirmation-and-enforcement tribunal of non-domestic arbitration awards under the Convention, and as a "competent authority of the country in which . . . that award was made," Convention, art. V(1)(e), authorized under Chapter 1 of the FAA to vacate arbitration awards entered in the United States. See Yusuf, 126 F.3d at 21-23.  While the distinction between vacation of an arbitration award and refusal to confirm an arbitration award may be of negligible significance within the United States, it can affect the remaining force of an unconfirmed award outside this country, if a party seeks to confirm and enforce the award under the Convention abroad.

-17-

Convention, art. V(1)(d), which authorizes a court to refuse confirmation of an arbitration award if the award was entered by an arbitral authority whose composition "was not in accordance with the agreement of the parties."

Deitsch presents two main arguments for the confirmation of the June 16, 2004, award. First, he argues that the Convention grants a

_____

However, as long as the Court had considered only Article V(1)(d) of the Convention, it should not have vacated the arbitration awards, as neither the Convention nor its enabling statute, 9 U.S.C. §§ 201-08, grant such a power with regard to non-domestic awards. See Yusuf, 126 F.3d at 22; M & C Corp. v. Erwin Behr GMBH & Co., KG, 87 F.3d 844, 849 (6th Cir. 1996); Tesoro Petroleum Corp. v. Asamera (South Sumatra), Ltd., 798 F. Supp. 400, 405 (W.D. Tex. 1992); Alan Scott Rau, The New York Convention in American Courts, 7 Am. Rev. Int'l Arb. 213, 234-36 (1996). Rather, the Court should have only refused to confirm the June 16, 2004, award, the confirmation of which was sought in Deitsch's cross-petition. Only if it had proceeded to analyze the claims Zeiler presented under 9 U.S.C. § 10(a), could the District Court have vacated the May 7, 2004, and the June 16, 2004, awards. However, given our view of the merits of the appeal, as discussed below, this broadening of the remedy is of no consequence.

-18-

district court discretion whether to confirm non-domestic awards even if they fall within the scope of Article V. Second, he argues that contrary to the District Court's view, the arbitration agreements allow two arbitrators, when facing the unique circumstances that existed in this case, to retain jurisdiction over the arbitration and enter the June 16, 2004, award.[7] We need not consider the first argument because we agree with the second.

The authority of the two remaining arbitrators after the resignation of the third one is essentially an issue of contract interpretation, grounded in the language of the agreements between the parties. See Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University, 489 U.S. 468, 476 (1989) ("[T]he federal policy [under the FAA] is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."). Because the District Court relied for its interpretation of the 2003 Agreement on the contractual language itself, we review de novo its inference that the 2003 Agreement could not be understood to foresee the possibility of a two-member disposition in the unique

---

[7]Deitsch also argues that this is the view of Jewish law, which was explicitly chosen by the parties to govern both the substance of the arbitration and the interpretation of the 2003 Agreement.

-19-

circumstances of this case. See Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co., 903 F.2d 910, 912 (2d Cir. 1990) ("The proper standard for appellate review of a pure textual construction by the district court, whatever the procedural posture of the case, is de novo."). On this issue of interpretation we disagree with the District Court.

Article V(1)(d) of the Convention authorizes courts to deny confirmation of arbitration awards entered by a panel whose composition was not in accord with the parties' agreement. Applying this article, the District Court focused its inspection on the 2003 Agreement's definition of "Beth Din." Because that definition specified the three named arbitrators, the Court ruled that a panel composed of only two of those originally named was not the panel agreed upon. Zeiler also argues that the only alternative under the 2003 Agreement to the three-member panel was "any other tribunal governed by Halachic law upon which the parties mutually agree." Since the parties did not reach a new agreement as to the panel's composition following Rabbi Tendler's resignation, Zeiler maintains that the award entered by the two remaining members was not in accordance with the parties' agreement.

We conclude that the naming of the three rabbis in the 2003

Agreement did not have the effect of precluding two members from continuing in the absence of a resigned member. Since the 2003 Agreement was executed after the three panel members had been identified, the more natural reading of the 2003 Agreement is that the three members were named only to reflect the choices previously made by the parties and their designated members, not to state a limitation on the authority of the panel to continue in the unexpected event that one of the members might resign. Cf. Doe v. Pataki, 481 F.3d 69, 76-77 (2d Cir. 2007) (recitation of terms of then-existing statutory provisions in agreement between state and private parties did not prohibit state from amending its statutes).

This conclusion is also consistent with the "Zabla" method that the parties had employed in appointing the three arbitrators. Although the parties did not explicitly mention "Zabla" in either the 1999 Arbitration Agreement or the 2003 Agreement, neither party disputes that this method was the basis for the appointment of the three named arbitrators. A natural implementation of the Zabla method when a member designated by a party resigns would be that party's appointment of a substitute. Cf. Trade & Transport, Inc. v. Natural Petroleum Charterers, Inc., 931 F.2d 191, 195-96 (2d Cir. 1991) (in domestic arbitration, absent express agreement to that effect, full

-21-

panel should not be removed due to the death of party-appointed member; replacement arbitrator should be designated).

Reading the parties' agreement to permit continuation of the panel in the event of a member's resignation, with the opportunity of the relevant party to appoint a successor, is especially appropriate in the circumstances of this case. The panel had already decided the substantive issues between the two sides. All that remained was determination of the amount of tax liabilities in light of the prior determination of the allocation of those liabilities. To read the agreement to require the proceeding to be halted upon the resignation of one member at that late stage of the proceedings would enable bad faith manipulation of the arbitration process: in an ongoing and complex arbitration, a party receiving unfavorable interim rulings would have an incentive to invite the member he designated to resign to forestall an anticipated ultimate defeat, or even, as in the pending case, after securing favorable rulings that are confirmable, to precipitate an arbitrator's resignation in the hope of avoiding confirmation of a later unfavorable award. The agreement should not be read to countenance the waste of resources required to redo a protracted arbitration proceeding in the event that one member of a

panel died or otherwise became unable to serve during the proceeding.[8]
A more sensible reading of the agreement makes continuation of the
remaining members of the panel (with an opportunity for appointment of
a replacement) the default position, subject to an explicit agreement

_____

[8]Zeiler's claim that federal and state courts have often reached
such an unreasonable conclusion is unpersuasive, as none of the cases
he cites involved a unique arbitration structure such as the one
before us nor an attempt by one party to abort an ongoing arbitration
while certain issues were still pending. See, e.g., Encyclopaedia, 403
F.3d at 91 (refusal to confirm under the Convention a single,
conclusive award); Szuts v. Dean Witter Reynolds, Inc., 931 F.2d 830
(11th Cir. 1991) (vacation under the FAA of single, conclusive award
and remand for new arbitration proceedings); Gutfreund v. Weiner (In
re Salomon Inc. Shareholders Derivative Litigation), 68 F.3d 554 (2d
Cir. 1995) (arbitration thwarted from the start by agreed arbitrator's
declining to arbitrate); New York Telephone Co. v. Pennsylvania
General Insurance Co., 87 A.D.2d 956, 451 N.Y.S.2d 219 (App. Div.
1982) (vacation of single, conclusive award entered after single
session); Golenbock v. Komoroff, 2 A.D.2d 742, 153 N.Y.S.2d 309 (App.
Div. 1956) (refusal to appoint replacement arbitrator for full
arbitration).

-23-

of the parties that only a panel with the three originally designated members still serving is authorized to render an award, albeit by a majority vote.

We note the parties' agreement that the arbitration is to be governed by Jewish law, an intricate set of norms culled from written and oral tradition and custom, as prescribed by widely accepted rabbinic authorities, but absent a singular authoritative code or a firm institutional structure. Not surprisingly, we have not been referred to any authoritative precedent under that body of law, and, in view of our interpretation of the parties' agreement, we need not rule definitively on what Jewish law would say if the parties' agreement did not resolve the pending issue. We would be surprised, however, should the issue arise, if Jewish law would permit the opportunity for manipulation of the sort we have identified.

We also believe that Zeiler's reliance on the latter part of the definition of "Beth Din" in the 2003 Agreement lacks merit. The words "other tribunal" signal that the parties did not intend this provision to apply to an instance such as the one before us, in which the original panel, although lacking one member, remains. Rather, the parties' power to mutually agree on some "other tribunal" contemplates the possibility of creating a wholly distinct mechanism of dispute

-24-

resolution, in case the parties choose to abandon the original "Beth Din."[9]

Because we believe the panel was entitled to continue after Rabbi Tendler's resignation, we conclude that the awards were confirmable and therefore reverse.

III. Confirmation of the Accounting Orders

The District Court confirmed, as a group, eight orders entered by the arbitration panel over the course of about four years, requiring Deitsch to provide Zeiler with accounting of the joint U.S. real estate, beginning in 1995, as well as documents regarding Zeiler's pension and insurance rights in the U.S. companies. Deitsch contends that the eight orders could not be confirmed because they were not final awards and because, even as "interim" awards, they were already satisfied. We disagree with both contentions and therefore affirm the

---

[9]We further note that while Zeiler stresses the centrality of the "other tribunal" alternative to the original three-member panel, he made no attempt to suggest the creation of some other tribunal in the three years that have passed since Rabbi Tendler's resignation, nor even now.

District Court's confirmation of the accounting orders.[10]

(a) <u>Finality of the orders.</u>  Deitsch views the eight accounting orders as interim discovery rulings that were all intended to facilitate a subsequent final resolution of the substantive commercial disputes between the parties, and should therefore be regarded as non-final and non-confirmable.  Zeiler, on the other hand, stresses the independent nature of Deitsch's accounting obligations and the

_____

[10] 9 U.S.C. § 207 sets a three-year statute of limitations for seeking confirmation of an arbitration award under the Convention. See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 580-81 (2d Cir. 1993); cf. Kerr-McGee Refining Corp. v. M/T Triumph, 924 F.2d 467, 471 (2d Cir. 1991).  While Zeiler's petition was filed in August 2004, the first four accounting orders he sought to confirm were entered between September 1999 and June 2001--more than three years earlier.  Because Deitsch did not raise a statute of limitations objection in the District Court, we consider it abandoned. See generally National Market Share, Inc. v. Sterling National Bank, Inc., 392 F.3d 520, 526 (2d Cir. 2004) ("If an affirmative defense is neither pled nor tried with the parties' consent, the defense is usually waived.").

-26-

separate value he attributes to receiving information about assets that are and will remain in joint ownership of both parties.

We agree with Zeiler that all of the accounting orders are final orders requiring accounting and transfer of documents. The decisions require specific action and do not serve as a preparation or a basis for further decisions by the arbitrators. They have "finally and conclusively disposed of a separate and independent claim" and therefore "may be confirmed although [they] do[] not dispose of all the claims that were submitted to arbitration." Metallgesellschaft A.G. v. M/V Capitan Constante, 790 F.2d 280, 283 (2d Cir. 1986); see also Sperry International Trade, Inc. v. Government of Israel, 532 F. Supp. 901, 909 (S.D.N.Y. 1982), aff'd, 689 F.2d 301 (2d Cir. 1982).[11]

The confirmable nature of the various accounting orders stems

_____

[11]Deitsch's reliance on Michaels v. Mariforum Shipping, S.A., 624 F.2d 411 (2d Cir. 1980), is unavailing. In Michaels, we reversed a district court's willingness to review a partial arbitral award that had decided only some of the liability claims, but had left other liability issues as well as damages determinations to a subsequent award. The accounting orders in the pending case are not segments of a future conclusive award, nor are they determinations required for furtherance of the arbitration.

from the unique character of this arbitration, as agreed by the parties. See Trade & Transport, 931 F.2d at 195 ("[I]f the parties agree that the panel is to make a final decision as to part of the dispute, the arbitrators have the authority and responsibility to do so."). This was not a "regular" arbitration, in which the arbitrators would hear all the evidence and eventually reach a conclusive resolution of the entire case. Rather, the arbitrators were asked to preside over the continuing process of sorting out the details of a commercial relationship, entering operative decisions along the way. The various decisions entered since the 1999 Decision were practical orders to the parties to take various actions, including conducting accountings and providing documents. Each order was specific and final and did not need to be followed by a concluding award.

(b) Confirmation of satisfied awards. Deitsch contends, in the alternative, that the District Court could not have confirmed awards that had already been complied with. Zeiler responds that the accounting orders are yet to be satisfied, and that in any event prior compliance is not a ground for refusal of confirmation. While expressing no view as to the factual question of Deitsch's compliance with the accounting orders, we agree with Zeiler that Deitsch has failed to show why prior compliance should serve as a ground for

-28-

refusal to confirm an arbitration award. Confirmation under the Convention is a summary proceeding in nature, which is not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm. See Encyclopaedia, 403 F.3d at 90. A district court confirming an arbitration award does little more than give the award the force of a court order. At the confirmation stage, the court is not required to consider the subsequent question of compliance. See, e.g., District Council No. 9 v. APC Painting, Inc., 272 F. Supp. 2d 229, 239 (S.D.N.Y. 2003); Collins v. D.R. Horton, Inc., 361 F. Supp. 2d 1085, 1093 (D. Ariz. 2005).

Because Deitsch did not provide a sufficient reason for refusing to confirm the eight accounting orders, we affirm the District Court's confirmation of these awards.

III. Scope of Enforcement

Having affirmed the District Court's confirmation of the eight accounting orders, we next consider Deitsch's second appeal, No. 06-5617, which contests the scope of the Court's order enforcing the confirmed arbitration awards. Deitsch contends that the District Court impermissibly went beyond the scope of the confirmed arbitration awards. Specifically, Deitsch understands the confirmed arbitration

-29-

awards to require accounting only until the date of entry of the last of the eight awards, February 18, 2004, and argues that the Court could not require an accounting for any period after that date. Zeiler, on the other hand, contends that the Court's order properly requires an accounting for the period ending on the date of the Court's enforcement order, November 9, 2006.

"As a general rule, once a federal court has entered judgment, it has ancillary jurisdiction over subsequent proceedings necessary to vindicate its authority, and effectuate its decrees.  This includes proceedings to enforce the judgment." Dulce v. Dulce, 233 F.3d 143, 146 (2d Cir. 2000) (quotation marks and internal citation omitted). In the context of an arbitration, the judgment to be enforced encompasses the terms of the confirmed arbitration awards and may not enlarge upon those terms.  However, enforcement is not confirmation. Once confirmed, the awards become enforceable court orders, and, when asked to enforce such orders, a court is entitled to require actions to achieve compliance with them.

In the pending case, after judgment was entered on March 22, 2006, Zeiler moved for an order requiring Deitsch "to comply with the . . . judgment and provide [Zeiler] with an accounting for the years 1995 to the present."  The District Court granted Zeiler's motion "in

all respects." That order is fairly understood to require an accounting "to the present," meaning the date of the Court's order, November 9, 2006.[12] It was entirely permissible for the Court to enforce its judgment by requiring an accounting up to that date in order to implement the judgment.

Conclusion

Accordingly, in No. 06-1893, we reverse that part of the District Court's judgment that vacated the arbitration awards of May 7, 2004, and June 16, 2004; affirm that part of the judgment that confirmed the eight accounting awards; and remand for entry of an amended judgment confirming the arbitration award of June 16, 2004. The stay previously entered is lifted. In No. 06-5617, we affirm the enforcement order.

---

[12]It is arguable that the motion's use of the phrase "to the present" should be understood to limit the accounting to the date of the motion, April 5, 2006. However, Deitsch has not made this argument, and we understand the "present" in the Court's order granting the motion on November 9, 2006, to mean the date of the Court's order. Counsel would have been well advised to avoid this ambiguity by specifying either a date certain or an event as the end point of the accounting it was then seeking.