Telenor Mobile Communications AS v. Storm LLC

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: February 4, 2009                    Decided: October 8, 2009)

Docket Nos. 07-4974-cv(L);
08-6184-cv(CON); 08-6188-cv(CON)

-------------------------------------

TELENOR MOBILE COMMUNICATIONS AS,

Petitioner-Appellee,

- v. -

STORM LLC,

Respondent-Appellant,

ALTIMO HOLDINGS & INVESTMENTS LIMITED,
ALPREN LIMITED, HARDLAKE LIMITED,

Additional Contemnors-Appellants.

-------------------------------------

Before:   SACK and PARKER, Circuit Judges, and STANCEU, Judge.[*]

Consolidated appeals from a judgment and post-judgment orders of the United States District Court for the Southern District of New York. In the judgment, the district court (Gerard E. Lynch, Judge) confirmed a final arbitral award in favor of the petitioner and denied the respondent's cross-motion to vacate. We agree with the district court that the arbitration panel did not "manifestly disregard" the law either by failing to

----

[*]  The Honorable Timothy C. Stanceu, of the United States Court of International Trade, sitting by designation.

give preclusive effect to Ukrainian court judgments that the parties' dispute was not arbitrable because the respondent's agent lacked authority to execute the agreement giving rise to the dispute, or by failing to require a trial to determine the agreement's arbitrability pursuant to Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26 (2d Cir. 2001). We also agree with the district court that the agreement was arbitrable as a matter of law because the respondent's agent had the apparent authority to execute it.

Affirmed.

ROBERT L. SILLS, Orrick, Herrington & Sutcliffe LLP (Jay K. Musoff, of counsel), New York, NY, for Petitioner-Appellee.

PIETER VAN TOL, Lovells LLP (Gonzalo S. Zeballos, of counsel), New York, NY, for Respondent-Appellant.

RONALD S. ROLFE, Cravath, Swaine & Moore LLP, New York, NY, for Additional Contemnors-Appellants.

SACK, Circuit Judge:

Telenor Mobile Communications AS ("Telenor"), a Norwegian company, and Storm LLC ("Storm"), a Ukrainian company, own Kyivstar G.S.M. ("Kyivstar"), a Ukrainian mobile telecommunications company. A shareholders agreement among the three companies dated January 30, 2004 (the "2004 Agreement") sets forth the terms of such ownership and provides that any disputes that arise in connection with the agreement will be

2

submitted to arbitration. The present consolidated appeals[1] result from an arbitration, commenced by Telenor, seeking relief for Storm's alleged breach of the 2004 Agreement.

This opinion addresses appeal No. 07-4974-cv, in which Storm challenges a judgment of the United States District Court for the Southern District of New York.[2] The district court (Gerard E. Lynch, Judge) granted Telenor's petition to confirm the arbitral award in its favor and denied Storm's cross-motion for vacatur.

On appeal, Storm argues that the arbitration panel "manifestly disregarded" the law in two respects. First, Storm contends it was reversible error for the panel to fail to give preclusive effect to Ukrainian court judgments concluding that the 2004 Agreement was not arbitrable because, according to the Ukrainian courts, the agent who signed the agreement on behalf of Storm was not authorized to do so. In the alternative, Storm contends, the panel manifestly disregarded our decision in Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26 (2d Cir. 2001), by failing to require a trial on the arbitrability issue in the district court. We conclude that the panel had colorable

---

[1]On October 5, 2009, the parties sought by stipulation to "withdraw [this appeal] from active consideration." We decline to do so. Cf. Khouzam v. Ashcroft, 361 F.3d 161, 167 (2d Cir. 2004) ("Action by the court is not a subject that the parties may negotiate among themselves, and a judicial act, such as a dismissal of a petition, is normally taken only when the appellate court determines that such action is warranted on the merits.")

[2] We address appeals from post-judgment orders of the district court in an accompanying summary order.

reasons for rejecting both arguments and it therefore did not manifestly disregard the law in either respect. Storm also contends, on the merits, that the 2004 Agreement is not arbitrable. We conclude, as did the arbitration panel and the district court, that Storm's agent had at least the apparent authority to execute the 2004 Agreement on behalf of Storm, and, therefore, that the agreement is arbitrable.

The judgment of the district court is therefore affirmed.

**BACKGROUND**

Events Prior to 2004

In 2002, a shareholders agreement dated March 26, 1998, (the "1998 Agreement") set forth the terms of the ownership of Kyivstar's shares. The 1998 Agreement contemplated the existence of five stakeholders, including Telenor and Storm. At some point in early 2002, however, Telenor and Storm agreed to attempt to buy out the other three stakeholders. By August of that year, they had nearly succeeded: only Omega JSC ("Omega") remained. In light of Kyivstar's newly altered ownership structure and in anticipation of Omega's eventual capitulation, Storm and Telenor negotiated an interim voting agreement between themselves (the "Voting Agreement"), which supplemented and altered their rights and obligations as to each other under the 1998 Agreement.

The Voting Agreement was executed on September 2, 2002. Valeriy Nilov, Storm's "General Director," signed for Storm. Three days earlier, Storm had sent Telenor a copy of a unanimous

4

resolution by Storm shareholders authorizing Nilov to do so.  See Storm LLC, Notice Regarding Resolutions Adopted by Written Polling, Aug. 30, 2002, at 2-3 ("Authorization of the General Director of . . . 'Storm', Nilov Valeriy Vladimirovich, to execute and deliver [inter alia, the Voting Agreement] and . . . take or cause to be taken any and all other actions, as are required or desirable in connection with this Resolution and the above-referenced agreements.").

The Voting Agreement contained a promise by each of the parties to execute a new shareholders agreement once Storm bought Omega's shares or the 1998 Agreement was terminated, whichever occurred first.  See Voting Agreement § 2.05 (providing that, within three days after the earlier of either condition, "the Shareholders [viz., Telenor and Storm] agree to, and to cause [Kyivstar] to, execute and deliver the New Shareholders Agreement").  A form for the contemplated new shareholders agreement was attached to the Voting Agreement as an exhibit.  It was in all substantive respects but one -- a provision setting forth the terms of material breach, which was later amended at Storm's request identical to what would be the 2004 Agreement.

On October 29, 2002, Storm sent Telenor a document, signed by Nilov, entitled "Certificate of Senior Officer of Purchaser."  The Certificate included, among other things, a copy of the Storm shareholders resolution authorizing Nilov to execute the Voting Agreement, and minutes of a meeting occurring on October 7, 2002, which confirmed the resolutions adopted by

written polling on August 30, 2002. The Certificate provided that those documents "constitute[] valid approval under the laws of Ukraine of [Storm's] execution, delivery and performance of [inter alia, the Voting Agreement] and any other documents in implementation of [inter alia, the Voting Agreement]."

### The 2004 Agreement

In January 2004, Storm purchased the outstanding Kyivstar shares from Omega. After negotiations between Storm and Telenor about possible alteration of the material breach provision of the contemplated new shareholders agreement, a negotiator for Storm wrote to Telenor by email on January 29, saying: "Storm reviewed the language of the New Shareholders Agreement that you distributed yesterday and agreed to it. We are ready to sign it tomorrow."

The following day, Nilov and representatives from Telenor and Kyivstar signed the 2004 Agreement. Storm sent Telenor two documents, each entitled "Certificate of Incumbency and Authority of Storm," which were signed by the chairman of Storm and another Storm official, respectively. The documents each certified that Nilov was "duly authorized to sign, on behalf of Storm[,] . . . the Shareholders Agreement dated January 30, 2004 between and among Telenor, Storm, Omega and Kyivstar." Unlike the 2002 "Certificate of Senior Officer of Purchaser," however, the "Certificate[s] of Incumbency and Authority of Storm" did not attach or incorporate by reference copies of documentation of the shareholder authorization.

6

The 2004 Agreement contains an arbitration provision stating that "[a]ny and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration by a panel of three (3) arbitrators under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules then in force."  2004 Agreement § 12.01(a).  It precludes any other sort of action "in connection with any matter arising out of or in connection with this Agreement," except for actions in connection with arbitration. Id. § 12.01(b).

### The Arbitration and the Ukrainian Proceedings

Pursuant to the 2004 Agreement's arbitration provision, Telenor instituted an arbitration against Storm on February 7, 2006, alleging that Storm had breached the 2004 Agreement by (1) violating its obligation thereunder not to frustrate Kyivstar board activities through Storm's absence; (2) violating a noncompete provision therein by "acquiring an equity interest in at least one other company engaged in the mobile telecommunications business in Ukraine"; and (3) violating the arbitration provision therein by "prosecut[ing] a series of court actions throughout Ukraine, attacking provisions of the Shareholders Agreement and Kyivstar's charter."  Telenor sought, among other relief, a declaration that Storm had breached the 2004 Agreement, an injunction requiring Storm to participate in the governance and management of Kyivstar, an anti-suit injunction, and damages.

7

On April 14, 2006 -- the day of the first conference of the arbitration panel -- Alpren Limited ("Alpren"), a Cyprus-based subsidiary of Altimo Holdings & Investment Limited ("Altimo"), brought suit in a Ukrainian court against Storm. Alpren and Altimo are the owners of Storm, and Alpren, Altimo, and Storm all belong to the same Russian corporate group, the Alfa Group Consortium. Alpren applied to the Ukrainian court for a declaration that the 2004 Agreement was invalid because Nilov lacked the authority to execute it on Storm's behalf. Apparently, neither Telenor nor the arbitration panel were notified of the Alpren lawsuit.

Storm retained no counsel and submitted no written defense to the Alpren suit. Instead, Vadim Klymenko, an Altimo officer responsible for that company's "litigation" and "arbitration" but who is not an attorney-at-law, appeared for Storm and registered an oral opposition on the ground that the arbitration panel had jurisdiction over Alpren's claim. The proceeding lasted approximately 20 minutes.

On April 25, 2006, the Ukrainian court concluded that Nilov lacked the authority to execute the 2004 Agreement on behalf of Storm. The court's decision "rendered" that agreement "null and void in full, including the arbitration clause, from the time of [Nilov's] execution [of the document]." Storm appealed. On May 25, 2006, the Ukrainian appeals court affirmed.

8

Five days later, Storm filed a statement of defense in the arbitration panel arguing, among other things, that Telenor's claims were not arbitrable in light of the Ukrainian judgment. Storm also moved before the panel to dismiss the arbitration. On October 22, 2006, the panel issued a partial final award and denied the motion. The panel concluded that it had jurisdiction to determine the 2004 Agreement's arbitrability. It also concluded that the dispute was arbitrable, notwithstanding the Ukrainian decision in the Alpren suit, because it found that Storm and Telenor "had a clear intent to have their disputes resolved through arbitration," and that the arbitration provision of the 2004 Agreement was severable and thus not subject to the Ukrainian judgment. Partial Final Award 11-13. The panel noted that the Ukranian court did not address the severability question, because Alpren and Storm did not present the question to the court and because Telenor was never even notified of the proceeding. Id. at 14.

Shortly thereafter, Storm asked the Ukrainian court of appeals to clarify whether, in the court's opinion, the arbitration provision of the 2004 Agreement and the agreement as a whole were invalid in light of the potential severability of the arbitration clause. On November 8, 2006, the court concluded, by now unsurprisingly, that the arbitration agreement was invalid and that any arbitration pursuant to it was in violation of the court's prior order.

9

On November 13, 2006, Storm applied in New York State Supreme Court for an injunction terminating the arbitration proceedings and vacating the partial final award in light of the Ukrainian decisions. Telenor removed the New York lawsuit to the United States District Court for the Southern District of New York. Storm then made a motion in that forum seeking a preliminary injunction. The district court denied the motion on the grounds that the panel's order was interlocutory and therefore not ordinarily subject to appeal, and that Storm was unlikely to prevail on the merits.

A Ukrainian court then, upon Alpren's application, enjoined Telenor, Storm, and Klymenko from participating in the arbitration. Telenor received no notice of the injunction and was not a party to this new Alpren lawsuit. Storm twice applied to the arbitration panel to stop the arbitration pursuant to the Ukrainian injunction, but the panel denied each application.

In an attempt to put a stop to the Ukrainian litigation, Telenor applied in these federal district court proceedings for an anti-suit injunction against Storm and its related entities. The district court issued such a temporary restraining order.

Following an evidentiary hearing, the district court issued an anti-suit injunction, writing that "there is no doubt that [the Ukrainian] litigation has been designed to, and has had the effect of, interfering in the arbitration process" -- indeed, that it was "conducted in the most vexatious way possible" -- and

10

that the court substantially agreed that "Nilov . . . had at least apparent authority to sign the [2004 Agreement]" under either New York or federal law. Storm LLC v. Telenor Mobile Commc'ns AS, No. 06 Civ. 13157(GEL), 2006 WL 3735657, at *8-*9, 2006 U.S. Dist. LEXIS 90978, at *23-*26 (S.D.N.Y. Dec. 18, 2006).

With the injunction in place, the arbitration hearings continued. Storm refused to participate.

On July 2, 2007, the arbitration panel issued a final award, which reaffirmed the partial final award's findings in light of subsequent events. See Final Award 33-36. The panel held, as relevant to this appeal, that Nilov had both actual and apparent authority under New York law to execute the 2004 Agreement on Storm's behalf, see id. at 36, 43-53, and that Storm was in breach of the agreement in several respects, see id. at 55. Telenor was granted injunctive relief but no damages. See id. at 65-68.

The Confirmation of the Award

Telenor petitioned the district court for a confirmation of the final arbitral award. Storm cross-moved for vacatur. With a lengthy opinion that appears to reflect decreasing patience with Storm's tactics, Telenor Mobile Commc'ns AS v. Storm LLC, 524 F. Supp. 2d 332 (S.D.N.Y. 2007), the court granted Telenor's application and denied Storm's. The court rejected Storm's contentions that the panel had manifestly disregarded the law by failing to give determinative effect to the Ukrainian judgments that the 2004 Agreement was never

11

executed by Storm and thus not arbitrable.  After conducting its own independent assessment of arbitrability, the district court concluded that Storm had proffered insufficient evidence to warrant a trial on the issue.  The court wrote:

> Storm provided every conceivable assurance to Telenor that its signatory officers were empowered to bind it to [the 2004 Agreement]. When Storm breached the agreement, it was provided with precisely the fair and impartial hearing it had bargained for . . . despite making repeated efforts to renege on its agreement and to torpedo the proceeding by collusive and vexatious litigation.

Id. at 369.

Storm appeals.

**DISCUSSION**

I. Governing Legal Standards

A. Review of Arbitral Awards Under the New York Convention

Federal jurisdiction over the final arbitral award in favor of Telenor arises from Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201-08, which empowers the federal courts to enforce arbitrations, such as this one, governed by the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention" or the "Convention").  See 9 U.S.C. § 201 ("The Convention . . . shall be enforced in United States courts in accordance with this chapter."); id. § 203 ("An action or proceeding under the Convention shall be deemed to arise under the laws and treaties of the United States.  The district courts of the United States . . . shall have original jurisdiction over

12

such an action or proceeding . . . ."); <u>Vaden v. Discover Bank</u>, 129 S. Ct. 1262, 1271 n.9 (2009).[3]

"Given the strong public policy in favor of international arbitration, review of arbitral awards under the New York Convention is very limited in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." <u>Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.</u>, 403 F.3d 85, 90 (2d Cir. 2005) (citation, internal quotation marks, and ellipsis omitted).  Storm's arguments on appeal implicate three types of such limited review.

1. Defenses to Enforcement of the Arbitral Award. Pursuant to the New York Convention as incorporated by the FAA, a district court, upon petition by a party to a qualifying arbitral award, "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention."  9 U.S.C. § 207. The Convention sets forth seven grounds for denial of confirmation, including, of relevance to this appeal, if

---

[3] The parties assume that the New York Convention governs this commercial dispute, and, because the dispute is between two foreign corporations, we conclude that that assumption is correct.  <u>See</u> <u>Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.</u>, 126 F.3d 15, 19 (2d Cir. 1997) (holding that New York Convention governed dispute involving conduct occurring in the Middle East between nondomestic parties and a domestic corporation, because Convention encompasses awards "pronounced in accordance with foreign law or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction" (quoting <u>Bergesen v. Joseph Muller Corp.</u>, 710 F.2d 928, 932 (2d Cir. 1983)), <u>cert. denied</u>, 522 U.S. 1111 (1998).

13

"recognition or enforcement of the award would be contrary to the public policy of [the] country [in which that relief is sought]," New York Convention, art. V(2)(b).[4]

---

[4] The grounds are:

(a) The parties to the agreement [to arbitrate] were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country were the award was made; or

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside by a competent authority of the country in which, or under the law of which, that award was made.

New York Convention art. V(1). And:

(a) The subject matter of the difference is not capable of settlement by arbitration

14

"The party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies." Encyclopaedia Universalis, 403 F.3d at 90. "The burden is a heavy one, as the showing required to avoid summary confirmance is high." Id. (citations, ellipsis, and internal quotation marks omitted); see also Zeiler v. Deitsch, 500 F.3d 157, 164 (2d Cir. 2007) (same).

2. Arbitrability. A dispute is arbitrable only if the parties contractually bind themselves to arbitrate it. See, e.g., AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (noting that "arbitration is a matter of contract"); see also First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) ("[T]he arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute."). A question of arbitrability is therefore raised when, as here, someone asserts that an arbitral award should not be enforced because there was no effective agreement to arbitrate the dispute.

Review of arbitrability questions is subject to two important presumptions: First, "the federal policy in favor of arbitration requires that 'any doubts concerning the scope of

---

under the law of that country [i.e., the country where recognition and enforcement is sought]; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

Id. art. V(2).

15

arbitrable issues' be resolved in favor of arbitration.'" Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120 (2d Cir. 2003) (quoting Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)). Second, arbitrability questions are presumptively to be decided by the courts, not the arbitrators themselves. See id. ("[W]hen the doubt concerns who should decide arbitrability . . . [t]he law [presumptively] favor[s] judicial rather than arbitral resolution."); see also First Options, 514 U.S. at 944-45. We have written that the latter presumption can be rebutted only by "clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002) (internal quotation marks and emphasis omitted); see also Shaw Group, 322 F.3d at 120-21.[5]

---

[5] In Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440 (2006), the Supreme Court made clear that in light of the severability of agreements to arbitrate generally, see id. at 445, the presumption of judicial resolution of arbitrability applies only when a party has specifically challenged the arbitration agreement -- "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance," id. at 445-46. But Buckeye expressly limited its holding to challenges to a "contract's validity," as distinguished "from the issue whether any agreement between the alleged obligor and obligee was ever concluded," including, as relevant to this appeal, "whether the signor lacked authority to commit the alleged principal." Id. at 444 n.1.

We have not modified our previous ruling that such questions about whether a contract was ever made -- like the question before us in the instant case -- are presumptively to be decided by the court even without a specific challenge to the agreement

16

The presumption that the court should decide arbitrability questions also applies when a party seeks to compel arbitration under the New York Convention. See New York Convention, art. II(3) (providing that the court "shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the . . . agreement is null and void, inoperative or incapable of being performed").  We addressed such a motion to compel in Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26 (2d Cir. 2001), writing that when "the making of the agreement to arbitrate is placed in issue . . . the court must set the issue for trial," so long as "the party putting the agreement to arbitrate in issue . . . present[s] 'some evidence' in support of its claim."  Id. at 30 (quoting Interocean Shipping Co. v. Nat'l Shipping & Trading Corp., 462 F.2d 673, 676 (2d Cir. 1972)).  Depending on the type of claimed inarbitrability, we noted that the party might also be required to make a specific challenge to the arbitration clause. See id.

---

to arbitrate.  See Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 31-32 (2d Cir. 2001) (holding that if a party alleges that an agreement is "void" -- as distinct from "voidable" -- the agreement's validity is subject to judicial resolution by "trial" without the party's having to challenge the arbitration clause in particular, so long as the party alleges "that [the] contract is void and provides some evidence in support").  Because we conclude below that even if Storm challenged the arbitration clause of the 2004 Agreement in particular, it has still failed to provide sufficient evidence that this dispute was not arbitrable, we need not decide whether this aspect of Sphere Drake survives Buckeye.  Cf. Rubin v. Sona Int'l Corp., 457 F. Supp. 2d 191, 193 (S.D.N.Y. 2006) (concluding that, in light of Buckeye, "[whether a party] argues that [an] agreement is void or voidable, [the party] may only avoid arbitration if it can successfully challenge the validity of the arbitration clause itself").

17

at 31-32 (noting that in setting an arbitrability issue for trial, a party alleging that a contract is void need not challenge the arbitration clause, but a party alleging that a contract is voidable must challenge the arbitration clause in particular); see also supra n.**[4]**.

3. Manifest Disregard. Federal courts with jurisdiction to enforce an arbitral award may also consider whether the award was in "manifest disregard" of the law. See Stolt-Nielsen SA v. Animalfeeds Int'l Corp., 548 F.3d 85, 91-92, 94-95 (2d Cir. 2008).[6] The boundaries of the manifest disregard

---

[6] In Hall St. Assocs., L.L.C. v. Mattel, Inc., 128 S. Ct. 1396 (2008), the Supreme Court observed that the "manifest disregard" doctrine might be a ground for review independent of the FAA, or might instead be a name for some, or all, of the grounds for vacatur of arbitral awards set forth in Section 10(a) of the FAA, 9 U.S.C. § 10(a), including circumstances "where the arbitrators were guilty of misconduct," id. § 10(a)(3), or "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," id. § 10(a)(4). See Hall St. at 1403-04 ("Maybe the term 'manifest disregard' was meant to name a new ground for review, but maybe it merely referred to the § 10 grounds collectively, rather than adding to them."). In Stolt-Nielsen, we read Hall St. to hold that the FAA set forth the "exclusive" grounds for vacating an arbitration award, and that the term "manifest disregard" was merely a "judicial gloss" on some of those grounds. Stolt-Nielsen, 548 F.3d at 94.

The Supreme Court has granted certiorari to review Stolt-Nielsen explicitly on another issue, see 129 S. Ct. 2793 (2009), but even if it confirms or rejects our interpretation of the term "manifest disregard," that will not affect this appeal. If the Stolt-Nielsen interpretation is correct, we may review this arbitral award for manifest disregard because the arbitration took place in the United States and therefore is "subject to the FAA provisions," like Section 10(a), "governing domestic arbitration awards." See Zeiler, 500 F.3d at 164; see also 9 U.S.C. § 208. If our interpretation was incorrect, this opinion will be applying a judicially created "non-statutory defense to enforcement." Telenor Mobile Commc'ns AS v. Storm LLC, 524 F. Supp. 2d 332, 344 (S.D.N.Y. 2007).

18

concept are not precisely defined, but the term "clearly means more than error or misunderstanding with respect to the law." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933 (2d Cir. 1986). A mere demonstration that an arbitration panel made "the wrong call on the law" does not show manifest disregard; "the award should be enforced . . . if there is a barely colorable justification for the outcome reached." Wallace v. Buttar, 378 F.3d 182, 190 (2d Cir. 2004) (emphasis in original) (internal quotation marks omitted). Examples of manifest disregard therefore tend to be extreme, such as "explicitly reject[ing] controlling precedent" or otherwise reaching a decision that "strains credulity" or lacks even a "barely colorable" justification. Stolt-Nielsen, 548 F.3d at 92-93 (internal quotation marks omitted). It is, in a word, "rare" to obtain relief from an arbitral award under this doctrine. Id. at 91 & n.7 (internal quotation marks omitted).

> The "manifest disregard" inquiry has three steps:

> First, we must consider whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators. . . .

> Second, once it is determined that the law is clear and plainly applicable, we must find that the law was in fact improperly applied, leading to an erroneous outcome. . . .

> Third, once the first two inquiries are satisfied, we look to the subjective element, that is, the knowledge actually possessed by the arbitrators. In order to intentionally disregard the law, the arbitrator must have known of its existence, and its applicability to the problem before him.

19

*Id.* at 93 (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389-90 (2d Cir. 2003)).

**B. Standard of Review**

As a general matter, "[w]e review a district court's decision to confirm an arbitration award *de novo* to the extent it turns on legal questions, and we review any findings of fact for clear error." *Duferco*, 333 F.3d at 388. Accordingly, here we review *de novo* the question whether the arbitration panel erred in a respect explicitly set forth by the FAA as a ground for vacatur of an arbitral award. *See, e.g.*, *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 219-23 (2d Cir. 2002).

Similarly, "'[w]hen a party challenges the district court's review of an arbitral award under the manifest disregard standard, we review the district court's application of the standard *de novo*.'" *Wallace*, 378 F.3d at 189 (quoting *The GMS Group, LLC v. Benderson*, 326 F.3d 75, 77 (2d Cir. 2003)).

**II. Analysis**

**A. The Ukrainian Judgments**

Storm argues that the arbitration panel manifestly disregarded the law governing the preclusive effect of foreign judgments when it failed to give such effect to the Ukrainian court judgments holding that the 2004 Agreement was never executed by Storm and is therefore not arbitrable. Storm also argues that its compliance with the arbitral award as enforced by the district court would entail actions that would place it in

20

contempt of the Ukrainian courts, contrary to New York public policy.

1. Manifest Disregard.  In Ackermann v. Levine, 788 F.2d 830 (2d Cir. 1986), we reiterated the "well-settled rule" that

> a final judgment obtained through sound procedures in a foreign country is generally conclusive as to its merits unless (1) the foreign court lacked jurisdiction . . . ; (2) the judgment was fraudulently obtained; or (3) enforcement of the judgment would offend the public policy of the state in which enforcement is sought.

Id. at 837 (emphasis in original).  Storm contends that the arbitration panel manifestly disregarded this rule by failing to give conclusive weight to the Ukrainian judgments that the 2004 Agreement is not arbitrable.[7]

The district court disagreed.  It concluded that the judgments obtained by Alpren against Storm had contravened the rule against "friendly litigation," see Lord v. Veazie, 49 U.S. (8 How.) 251, 256 (1850) (concluding that such litigation results in a judgment which "is a mere form" and is therefore "a nullity").  The district court remarked that it and the arbitration panel had both previously found the Alpren litigation to have been collusive.  Telenor, 524 F. Supp. 2d at 346-47.  The district court also concluded that the Ukrainian proceedings had afforded Telenor no notice or opportunity to be heard prior to the entry of the judgment, and that they were intended to

---

[7]  The first and third steps of the manifest disregard inquiry -- that the Ackermann rule was clear, plainly applicable, and made known to the arbitration panel -- are undisputed.

21

undermine a possible confirmation of an award in Telenor's favor. Id. at 347. In light of those conclusions, the court found that the Ukrainian procedures were not "sound" for Ackermann purposes and therefore not binding on the arbitration panel. Id. at 348.

Storm argues that the arbitration panel did not actually find that the Ukrainian actions by Alpren were collusive. To be sure, the panel did not employ the word "collusive" in its partial or final award. But the panel does mention, repeatedly, that the Alpren litigation was conducted among related corporate entities, see, e.g., Final Award 21 ("As previously noted, Alpren and Storm were under the direct or indirect control of Altimo, and the ultimate control of Alfa."), without notice to or appearance by Telenor, see, e.g., id. at 17 ("Telenor . . . had no notice of the Ukrainian proceedings until after the order of the Ukrainian appellate court . . . ."); id. ("[T]he April-May 2006 Ukrainian court proceedings came as a surprise to both the Tribunal and to Telenor . . . ."). The panel's repeated observations along these lines make clear that the panel considered the Ukrainian proceedings to have been collusive, even though the panel understandably elected to avoid using that term in relation to proceedings before a duly constituted foreign court. See id. at 25 (noting that the panel had previously "made clear" that it was not "ignoring the decisions of the Ukrainian courts . . . [or] impugning the integrity of those courts or their decisions").

22

Politic or not, in light of the "strong presumption that an arbitration tribunal has not manifest[ly] disregarded the law," Westerbeke, 304 F.3d at 212 n.8, the panel's multiple references to the Alfa-internal and ex parte nature of the Alpren litigation supply a sufficiently "colorable" justification for its refusal to give the Ukrainian judgments controlling weight. Cf. Motorola Credit Corp. v. Uzan, 388 F.3d 39, 60-61 (2d Cir. 2004) (affirming denial of comity to injunctions entered by Turkish courts that "were the product of collusion").

Storm does not seriously dispute that the Alpren litigation was a cooperative venture among allied interests.[8] It argues, instead, that Storm "had no contact" with its adversary during the litigation, that it "presented a defense" in the proceedings, and that it "appealed." Appellant Br. 42. But these assertions, if true, would not refute the panel's finding of collusion on the facts of this case and would not be a basis upon which the district court was required to overturn that finding. The panel was not obliged to interpret Storm's decidedly modest efforts in the Alpren suit to be material or meaningful.[9]

---

[8] Storm does rely upon a declaration from Klymenko, submitted after judgment was entered by the district court, which says that Storm, Alpren, and Altimo are not "the same entities." We decline to find clear error on the basis of a self-serving declaration that the district court had no opportunity to consider.

[9] Moreover, Storm offers no good reason why we should not affirm on the district court's finding of collusion. See Telenor, 524 F. Supp. 2d at 346-47.

Moreover, "the force of" the Ukrainian judgments as against Telenor is "further reduced" by the fact that Telenor was not a party to the Alpren litigation and was continually denied notice of the proceedings. Final Award 34; see also id. at 21-22, 25-27; Telenor, 524 F. Supp. 2d at 346-47. The failure of the Ukranian court to afford Telenor what we would regard as rudimentary due process, see Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or privy and therefore never had an opportunity to be heard."), provides an independent colorable justification for the panel's conclusion that the Ukrainian proceedings were unsound for Ackermann preclusion purposes.

It was the opinion of a witness whom Storm proffered as an expert that "Telenor . . . could have intervened" in the Alpren litigation after it was notified of the judgment against it "for purposes of filing an appeal to Ukraine's highest court" but "chose not to do so." That is beside the point for at least two reasons. First, this opinion testimony, if assumed to constitute competent evidence of the process actually available to Telenor in the Alpren litigation, would fail to demonstrate that Telenor, after intervening solely for purposes of appeal, would have been afforded a full and fair opportunity to be heard on the merits of the issues decided in that litigation. Second, it would not in any event be sufficient to have warranted a reversal by the district court under the "manifest disregard"

24

standard. See Stolt-Nielsen, 548 F.3d at 91 ("We do not . . . 'recognize manifest disregard of the evidence as proper ground for vacating an arbitrator's award.'" (quoting Wallace, 378 F.3d at 193) (emphasis added in Stolt-Nielsen)).

The Ukrainian decisions therefore provide no basis for a denial of enforcement of the final arbitral award on "manifest disregard" grounds.

2. Public Policy.

Storm argues that the arbitral award should nonetheless be vacated pursuant to Article V(2)(b) of the New York Convention because, Storm says, it is contrary to New York public policy to force a party to comply with an arbitral award that will cause it to violate a foreign judgment. We do not think that Storm can properly invoke the protection of any such policy.

Two factfinders have concluded that Storm brought the Ukrainian judgments upon itself through use of highly questionable litigation tactics. See Final Award 21, 25; Telenor, 524 F. Supp. 2d at 346-47, 356-58. Storm's situation, like that of the apocryphal parricide seeking mercy because he had been orphaned, is entirely of its own making.

Our view, in light of the findings of the arbitration panel and the district court, is that it is Storm's improper collateral litigation, not the arbitral award, that is contrary to public policy, viz., the well-established federal public policy in favor of arbitration. See, e.g., Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289, 294 (2d

25

Cir. 1999) ("Through the FAA, Congress has declared a strong federal policy favoring arbitration as an alternative means of dispute resolution." (internal quotation marks omitted)). Collateral and unilateral litigation of arbitrability – or any other issue pertinent to an arbitration, for that matter -- undertaken in a foreign forum by a party to that arbitration in an attempt to protect itself from an adverse arbitral award would, if indulged, tend seriously to undermine the underlying scheme of the FAA and the New York Convention.

Article V(2)(b) must be "construed very narrowly" to encompass only those circumstances "where enforcement would violate our most basic notions of morality and justice." Europcar Italia S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 315 (2d Cir. 1998) (internal quotation marks omitted). Consistent with that rule, we conclude that enforcing the arbitral award as against Storm would not be contrary to public policy.

B.  Sphere Drake and Arbitrability

Storm argues that the panel manifestly disregarded Sphere Drake when it failed to arrange for a trial to be held on the arbitrability of the 2004 Agreement. Storm also argues that the district court erred in making its own determination, de novo, that the 2004 Agreement was executed by Storm. We conclude to the contrary that Storm failed to present "some evidence" of a dispute as to arbitrability so as to warrant a trial under Sphere

26

Drake.[10]  In particular, Storm has not provided sufficient evidence to support its allegation that Nilov lacked apparent authority to execute the agreement on behalf of Storm.

Under New York law,[11] an agent has apparent authority if "a principal places [the] agent in a position where it appears that the agent has certain powers which he may or may not possess."  Masuda v. Kawasaki Dockyard Co., 328 F.2d 662, 665 (2d Cir. 1964).  The apparent authority question is susceptible to judgment as a matter of law against the principal.  See, e.g., Warnock Cap. Corp. v. Hermitage Ins. Co., 21 A.D.3d 1091, 803 N.Y.S.2d 606 (2d Dep't 2005).  Here, there is no genuine issue of fact, let alone a material one, as to Nilov's apparent authority: There is substantial evidence that Telenor received multiple notices from Storm that Nilov had the authority to execute the 2004 Agreement and there is no evidence, at least that has been

---

[10]  We do not reach the question of whether Storm was required to challenge the arbitrability of the arbitration clause, in particular, or whether it in fact did so.  Even if Storm challenged the arbitration clause itself, as it contends, we would reach the same result.

[11]  The 2004 Agreement provides that it "shall be governed by, and construed in accordance with," New York law, "without giving effect to any conflicts of laws principles . . . which would result in the application of the laws of another jurisdiction."  2004 Agreement § 13.06.  This choice of law clause governs Storm's arbitrability challenge.  See Motorola Credit Corp. v. Uzan, 388 F.3d 39, 50 (2d Cir. 2004) ("[A] choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract."), cert. denied, 544 U.S. 1044 (2005).  By the terms of the clause, Storm is incorrect that Ukrainian law applies to the dispute as a matter of New York conflicts principles.

27

brought to our attention, that Telenor should have thought otherwise.

The record reflects that Storm sent Telenor a variety of signals that Nilov had the authority to execute the 2004 Agreement. Among them:

● In 2002, Telenor received a copy of the August 20, 2002 Storm shareholders resolution, which referenced both the Voting Agreement and the draft shareholders agreement that ultimately became the 2004 Agreement and authorized Nilov "to execute and deliver [those] agreements" and to "take or cause to be taken any and all other actions, as are required or desirable in connection with this Resolution and the above-referenced agreements." Storm LLC, Notice Regarding Resolutions Adopted by Written Polling, Aug. 30, 2002, at 3.

● Nilov executed -- with actual authority -- the Voting Agreement providing that Storm "agree[d] to . . . execute and deliver the New Shareholder Agreement." Voting Agreement § 2.05.

● Telenor received an email from a Storm negotiator stating that Storm was "ready to sign" the 2004 Agreement, and discussing Nilov's availability to sign it, the day before Nilov actually signed it.

● Telenor received documentation from Storm signed by Storm's chairman and another official, stating that Nilov was "duly authorized" to execute the agreement on Storm's behalf. See Storm LLC, Certificate of Incumbency and Authority of Storm, Jan. 30, 2004.

Storm does not challenge the validity of these representations to Telenor of Nilov's apparent authority to execute the agreement. Rather, Storm argues that Telenor should have deduced from the Storm charter and from having not received documentation of any shareholder meeting specifically authorizing Nilov to sign the 2004 Agreement, despite Storm's repeated statements that he was so authorized, that Nilov's execution

28

required a shareholder meeting for authorization. This fails to raise a genuine issue of material fact. For one thing, Storm cites nothing in the record (including in the charter) to support the proposition that Nilov required shareholder approval to execute the 2004 Agreement on his company's behalf. For another, there is no evidence from which a rational juror might infer that Telenor should have concluded that there was no such meeting, in light of Storm's repeated assurances that Nilov was indeed duly authorized.

Storm has, moreover, failed to explain why Nilov would sign the agreement without authorization.

In any event, the record evidence shows that everyone at the relevant time, including Storm, thought that Nilov had the authority to execute the agreement. That is sufficient ground on which to conclude that Storm has failed to proffer sufficient evidence from which a rational juror could conclude that Nilov lacked apparent authority to execute the 2004 Agreement and that no trial was required to find out if the agreement was, or was not, arbitrable.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is affirmed.

29